UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

**JONATHAN GAFFERS,** individually,
and on behalf of others similarly situated,

        Plaintiffs,

                                Case No. 16-10128

vs.

                                Hon. David M. Lawson

**KELLY SERVICES, INC.,**
a Michigan corporation

        Defendant.

---

SEYFARTH SHAW, LLP.
BY:   Gerald L. Maatman, Jr.
Peter J. Wozniak
Christopher M. Cascino
***Attorneys for Defendant***
131 S. Dearborn Street
Suite 2400
Chicago, IL 60603
312-460-5000
gmaatman@seyfarth.com

KIENBAUM OPPERWALL HARDY
& PELTON, P.L.C.
BY:   William B. Forrest III
***Attorney for Defendant***
280 North Old Woodward Avenue,
Suite 400
Birmingham, Michigan 48009
Office:  248-645-0000
Fax:  248-723-1110
wforrest@kohp.com

---

**RESPONSE IN OPPOSITION TO PLAINTIFF'S PRE-DISCOVERY
MOTION FOR CONDITIONAL CLASS CERTIFICATION AND COURT-
<u>SUPERVISED NOTICE PURSUANT TO 29 U.S.C. § 216(b)</u>**

## ISSUES PRESENTED

1.    Has Plaintiff met his burden of showing that there exists a common factual nexus among the members of the putative collective such that their claims are susceptible to common proof on a collective basis?

*Suggested Answer:  No.*

2.    Has Plaintiff met his burden of showing that this case is manageable as a collective action and that he is an adequate representative of the putative collective?

*Suggested Answer:  No.*

3.    Should the Court deny Plaintiff's Motion for his failure to seek Defendant's concurrence as required by Local Rule 7.1 prior to filing his Motion?

*Suggested Answer:  Yes.*

## TABLE OF CONTROLLING/MOST APPROPRIATE AUTHORITIES

Page(s)

**Cases**

*Arrington v. Michigan Bell Tel. Co.*,
No. 10-10975, 2011 WL 3319691 (E.D. Mich. Aug. 1, 2011)................................... 9, 11, 13

*Fischer v. Kmart Corp.*,
No. 13-CV-4116, 2014 WL 3817368 (D.N.J. Aug. 4, 2014) ............................................ 19

*Frye v. Baptist Mem'l Hosp., Inc.*,
No. 07-2708, 2008 U.S. Dist. LEXIS 107139 (W.D. Tenn. Sept. 16, 2008) ...................... 9

*Harrison v. McDonald's Corp.*,
411 F. Supp. 2d 862 (S.D. Ohio 2005) ..............................................................9, 10, 11, 13

*Little Caesar Enters., Inc. v. Divine Commercial Enters.*,
No. 11-CV-13163, 2011 WL 3235475 (E.D. Mich. July 28, 2011) .................................... 24

*Longnecker v. American Express Co.*,
No. 14-CV-69, 2014 WL 4071662 (D. Ariz. Aug. 18, 2014) ............................................ 19

*O'Neal v. Emery Federal Credit Union*,
No. 1:13–CV–22, 2013 WL 4013167 (S.D. Ohio Aug. 6, 2013)............................... 9, 10, 14

*Perry v. Randstad General Partner (US) LLC*,
No. 14-11240, 2015 WL 2237829 (E.D. Mich. May 12, 2015) ........................................... 9

*Pullen v. McDonald's Corp.*,
Nos. 14-11081 & 14-11082, 2014 WL 4610296 (E.D. Mich. Sept. 15, 2014) ................... 21

*Salleen v. Waste Management, Inc.*,
No. 08-CV-4959, 2009 WL 1664451 (D. Minn. June 15, 2009) .................................... 8, 21

*Shipes v. Amurcon Corp.*,
No. 10-14943, 2012 WL 995362 (E.D. Mich. Mar. 23, 2013)........................................ 9, 12

*West v. Border Foods, Inc.*,
No. 05-2525, 2006 WL 1892527 (D. Minn. June 12, 2006) ............................................. 14

*White v. Osmose, Inc.*,
No. 01–A–877–N, 204 F. Supp. 2d 1309 (M.D. Ala. 2002) ............................................. 21

*Wlotkowski v. Mich. Bell Tel. Co.*,
No. 09–11898, 267 F.R.D. 213 (E.D. Mich. 2010) ......................................................... 25

**Other Authorities**

Local Rule 7.1 ................................................................................................... 1, 10, 23

### <u>TABLE OF CONTENTS</u>

<u>Page</u>

ISSUES PRESENTED ............................................................................................... v

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ....................................................................................1

PROCEDURAL BACKGROUND ...........................................................................8

ARGUMENT ..........................................................................................................8

I.      PLAINTIFF BEARS THE BURDEN OF DEMONSTRATING THAT CONDITIONAL COLLECTIVE ACTION CERTIFICATION IS APPROPRIATE ............................................................................................8

II.     CERTIFICATION OF A NATIONWIDE COLLECTIVE ACTION IS INAPPROPRIATE AS A MATTER OF LAW ................................................10

       A.    The Court Should Strike Or Disregard The Declarations .....................10

       B.    Plaintiff Is Not Similarly Situated To The Other Putative Collective Action Members ................................................................................14

           1.    Logging-In: Not Similarly Situated .........................................15

           2.    Logging-Out: Not Similarly Situated........................................16

           3.    Entering Time: Not Similarly Situated .....................................18

           4.    Technical Support: Not Similarly Situated ................................19

           5.    Arbitration Agreements With Collective Action Waivers: Not Similarly Situated...........................................................19

       C.    Collective Action Certification Should Be Denied: Manageability And Adequacy .............................................................................20

       D.    Local Rule 7.1 Requires Denial Of Plaintiff's Motion ..........................23

III.    TWO FORMS OF NOTICE IS INAPPROPRIATE ........................................25

iii

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adami v. Cardo Windows, Inc.*,
  No. 12–2804 (JBS/JS), 299 F.R.D. 68 (D.N.J. 2014)..............................................20

*Arrington v. Michigan Bell Tel. Co.*,
  No. 10-10975, 2011 WL 3319691 (E.D. Mich. Aug. 1, 2011)...........................9, 11, 13

*Bodner v. Oreck Direct, LLC*,
  No. C 06-4756, 2007 WL 1223777 (N.D. Cal. April 25, 2007)............................22

*Boyd v. Alutiiq Global Solutions, LLC*,
  11-CV-0753, 2011 WL 3511085 (N.D. Ill. Aug. 8, 2011)...................................12

*Cason v. Vibra Healthcare*,
  No. 10-10642, 2011 WL 1659381 (E.D. Mich. May 3, 2011)..............................8

*CFE Racing Prods., Inc. v. BMF Wheels, Inc.*,
  No. 11-CV-1845749 (E.D. Mich. Apr. 30, 2013)...............................................24

*Espenschied v. DirectSat USA, LLC*,
  No. 12–1943, 705 F. 3d 770 (7th Cir. 2013) .......................................................20

*Fischer v. Kmart Corp.*,
  No. 13-CV-4116, 2014 WL 3817368 (D.N.J. Aug. 4, 2014) ..............................19

*Frye v. Baptist Mem'l Hosp., Inc.*,
  No. 07-2708, 2008 U.S. Dist. LEXIS 107139 (W.D. Tenn. Sept. 16, 2008) ........9

*Gaffers v. Sitel Worldwide Corp.*,
  No. 16-CV-128 (C.D. Tenn.)............................................................................1, 2

*Goldfaden v. Wyeth Labs., Inc.*,
  No. 08-10944, 2010 WL 2011310 (E.D. Mich. May 19, 2010), *aff'd*, 482 F. App'x 44
  (6th Cir. 2012) .................................................................................................12

*Gromek v. Big Lots, Inc.*,
  No. 10 C 4070, 2010 WL 5313792 (N.D. Ill. Dec. 17, 2010) ..........................9, 20

*Guillen v. Marshalls of MA, Inc.*,
  No. 09 Civ. 9575, 750 F. Supp. 2d 469 (S.D.N.Y. 2010).....................................14

*Harrison v. McDonald's Corp.*,
  411 F. Supp. 2d 862 (S.D. Ohio 2005) ....................................................9, 10, 11, 13

*Knispel v. Chrysler Grp. LLC*,
  No. 11–11886, 2012 WL 553722 (E.D. Mich. Feb. 21, 2012)...........................25

*Little Caesar Enters., Inc. v. Divine Commercial Enters.*,
No. 11-CV-13163, 2011 WL 3235475 (E.D. Mich. July 28, 2011) .................................................. 24

*Longnecker v. American Express Co.*,
No. 14-CV-69, 2014 WL 4071662 (D. Ariz. Aug. 18, 2014) ...................................................... 19

*Mark v. Gawker Media LLC*,
No. 13 Civ. 4347, 2015 WL 2330079 (S.D.N.Y. March 5, 2015) ................................................. 22

*O'Neal v. Emery Federal Credit Union*,
No. 1:13–CV–22, 2013 WL 4013167 (S.D. Ohio Aug. 6, 2013) ............................................. 9, 10, 14

*Perry v. Randstad General Partner (US) LLC*,
No. 14-11240, 2015 WL 2237829 (E.D. Mich. May 12, 2015) ............................................................ 9

*Pullen v. McDonald's Corp.*,
Nos. 14-11081 & 14-11082, 2014 WL 4610296 (E.D. Mich. Sept. 15, 2014) .................................. 21

*Robinson v. Sheriff of Cook County*,
No. 98–2333, 167 F.3d 1155 (7th Cir. 1999) ................................................................ 21, 22

*Salleen v. Waste Management, Inc.*,
No. 08-CV-4959, 2009 WL 1664451 (D. Minn. June 15, 2009) ..................................................... 8, 21

*Shipes v. Amurcon Corp.*,
No. 10-14943, 2012 WL 995362 (E.D. Mich. Mar. 23, 2013) ........................................................ 9, 12

*Tyson Foods, Inc. v. Bouaphakeo*,
No. 14–1146, 136 S. Ct. 1036 (2016) .......................................................................... 21

*West v. Border Foods, Inc.*,
No. 05-2525, 2006 WL 1892527 (D. Minn. June 12, 2006) ........................................................... 14

*White v. MPW Indus. Servs.*,
No. 1:05-CV162, 236 F.R.D. 363 (E.D. Tenn. 2006) ................................................................ 12

*White v. Osmose, Inc.*,
No. 01–A–877–N, 204 F. Supp. 2d 1309 (M.D. Ala. 2002) ......................................................... 21

*Wlotkowski v. Mich. Bell Tel. Co.*,
No. 09–11898, 267 F.R.D. 213 (E.D. Mich. 2010) ................................................................. 25

**Statutes**

29 U.S.C. § 216(b) .........................................................................................8, 10, 11, 21

**Other Authorities**

Local Rule 7.1 ....................................................................................... 1, 10, 23

Federal Rule of Civil Procedure Rule 23 ................................................................... 21

## INTRODUCTION

Plaintiff Jonathan Gaffers ("Plaintiff") seeks to pursue his "off the clock" claims on behalf of over 6,000 employees of Defendant Kelly Services, Inc. ("Defendant" or "Kelly") who worked remotely in at least 11 different job positions in 48 states.  In support of his sweeping request, Plaintiff relies entirely on seven declarations from himself and six putative collective action members – declarations that on their face show why the potential opt-ins are not similarly situated.  Accordingly, the Court should deny Plaintiff's Motion on at least three independent grounds.  *First*, Plaintiff has not shown that he and the nationwide putative collective action members are similarly situated.  These employees work from home in at least 11 different job positions, and in 48 states, using different hardware and software to perform different functions for different customers.  In sum, Plaintiff has made no showing of  a common factual nexus among these employees such that their claims are susceptible to common proof on a collective basis.  *Second*, because the claims demand individualized analysis of each employee's experiences, the proposed collective action would require an unmanageable series of mini-trials.  *Third*, the Motion should be denied because it violates Local Rule 7.1 and this Court's Practice Guidelines, the latter of which provides that "[t]he Court strictly enforces . . . Local Rule 7.1" and that "[f]ailure to follow [Local Rule 7.1] likely will result in a denial of the motion . . . ."[1]

## FACTUAL BACKGROUND

Plaintiff Gaffers was employed by Kelly from June 30, 2014 through April 14, 2016.  (ECF No. 7 at 3; Turansky Decl. ¶ 3.)  Prior thereto, Plaintiff was a home-based customer care agent for Sitel Worldwide Corporation ("Sitel").  (*Gaffers v. Sitel Worldwide Corp.*, No. 16-CV-128 (C.D. Tenn.), ECF No. 1 ¶ 12.)  On February 2, 2016, Plaintiff's same counsel filed suit

---

[1] Plaintiff's Motion also exceeds Local Rule 7.1's 25-page limit for "a brief supporting a motion or response, including footnotes and signatures."  Plaintiff's Motion is 27 pages.  (ECF No. 7.)

2:16-cv-10128-DML-SDD   Doc # 57   Filed 04/22/16   Pg 8 of 32   Pg ID 1053

against Sitel on behalf of Gaffers and other purported similarly situated home-based customer
care agents.  (*Id.* ¶ 65.)  As in this case, Plaintiff claims that Sitel failed to pay him and the
putative collective action for pre-shift and post-shift duties and for technical support time.  (*Id.* ¶¶
56, 69.)  In that case, he also moved to conditionally certify a collective action of "[a]ll current
and former hourly home-based customer care agents who worked for Defendant(s) at any time
during the past three years."  (ECF No. 7 at 26; *Sitel Worldwide* ECF No. 6 at 19.)

Kelly provides a broad array of outsourcing and consulting services as well as world-class
staffing on a temporary, temporary-to-hire, and direct-hire basis.  (ECF No. 1 ¶ 2.)  It employs
more than half a million individuals, and has a role in creating employment opportunities for
more than one million workers around the globe.  (*Id.*)  Kelly employed the putative collective
action members in different positions, required them to use different software and hardware,
required them to provide different services, and subjected them to different timekeeping policies.

**Different Job Positions:**  Contrary to Plaintiff's allegations, Kelly does not employ any
"Home Based Customer Care Agents."  (Turansky Decl. ¶ 38.)  Instead, the Declarants, Opt-Ins
and members of the putative collective all hold one of *at least 11 remotely-based positions*.
(Turansky Decl. ¶¶ 3 – 24.)[2]

**Different Software And Hardware:**  In support of his Motion, Plaintiff and six of the
Opt-Ins submitted declarations ("Declarations").  (ECF Nos. 7-4, 41-2, 41-3, 41-4, 41-5, 49-2,
49-3.)  The Declarations submitted by Plaintiff make clear that employees in each of the 11
positions used different software programs to perform their jobs.  The Declarants list 35 unique
steps that allegedly must be taken and/or programs which allegedly must be accessed each day.

---

[2] The 11 positions are: (1) AppleCare Tier 1 Advisors; (2) AppleCare Tier 1 Chat Advisors; (3)
AppleCare Tier 2 Advisors; (4) AppleCare Tier 2 Chat Advisors; (5) AppleCare Tier 1
CPU/Mac+ Advisors; (6) AppleCare Tier 1 CPU/Mac+ Chat Advisors; (7) AppleCare Tier 2
CPU/Mac+ Advisors; (8) AppleCare Tier 2 CPU/Mac+ Chat Advisors; (9) AOS Customer
Service Representatives; (10) AppleCare Team Lead; and (11) IT SC Agents.  (*Id.* ¶¶ 3 – 24.)

(*See* Maatman Decl. ¶ 9, Ex. 5.)  Of the 35 unique steps and/or programs, the Declarants agree on just three: (1) "Starting my computer"; (2) iLog; and (3) "Joining any applicable chat rooms (pod chats)." (*See id.*).  Further, one of these three areas of agreement, iLog, is not used by employees in two of the above positions (AOS Customer Service Representatives and IT SC Agents).  No Declarants were employed in either of those two positions, but multiple Opt-Ins were, and these two positions represent *at least 16%* of the putative collective action.  (Turansky Decl. ¶ 41.)

Depending on their position, employees also used different hardware.  Specifically, IT SC Agents used their own computers, while putative collective action members in other positions used hardware provided by Kelly.  (*Id.* ¶ 43.)

**Different Services:**  The members of the putative collective action who worked for the same client as Gaffers and the other Declarants provided various different services for Kelly's client.  Some provided support for devices and software purchased from Kelly's client.  Others provided support for computers purchased from Kelly's client.  Others provided support for the client's on-line store, helping customers to purchase the client's products.  (*Id.* ¶¶ 25 – 33.)  Some Opt-Ins provided second-level, home-based IT support for businesses.  (*Id.* ¶ 36.)  Others supervised the work of other Kelly employees, and were exempt from overtime.  (*Id.* ¶ 34.)

**Different Mediums:**  Different members of the putative collective action provided services via different mediums.  Specifically, some members of the putative collective action provided support via telephone, while others provided support via chat programs.  (*Id.* ¶ 26.)

**Different Timekeeping Policies:**  The members of the putative collective action were subject to different timekeeping policies.  As an initial matter, AppleCare Team Leads, such as Opt-In Plaintiff Armistead, were exempt.  (*Id.* ¶¶ 20 & 34.)  Non-exempt putative collective members were required to record all their time worked in Kelly Web Time.  (*Id.* ¶ 53, Ex. 1 at 3

("Record and report all actual hours worked – no more and no less – for each day worked."); *id.*
¶ 54, Ex. 2 at 3 (same); McCanham Decl. ¶ 6, Ex. 3 at 10; ECF No. 7-6 at 3.)

      Kelly instructed all non-exempt putative collective action members to report their boot up
and shut down times as time worked.  (Turansky Decl. ¶ 53, Ex. 1 at 10 ("Kelly employees must
record all actual hours worked, no more and no less.  This may include recording and reporting
time for activities such as logging on to a customer's system . . . ."); *id.* ¶ 54, Ex. 2 at 10 (same);
McCanham Decl. ¶ 6, Ex. 3 at 5 ("work time begins when you begin the login process"); ECF
No. 7-6 at 3 ("I will record my time worked including computer boot-up and log-off time")).
Moreover, all AppleCare and AOS employees were "pre-approved to add five minutes before
start of shift to boot your computer and log in" and "five minutes at the end of your shift to log
out and shutdown your computer."  (McCanham Decl. ¶ 4, Ex. 1; *id.* ¶ 5, Ex. 2.)

      Kelly requires all AppleCare employees to review a report showing the time they were
logged-in to the iDesk and iLog programs before submitting their time.  (Turansky Decl. ¶ 46;
ECF No. 7-5 at 1; Tovar Decl. ¶ 6.)  Kelly requires AOS employees to review a different report,
showing the time they were logged-in to a program called Softphone, not iDesk or iLog.
(Turansky Decl. ¶ 47.)  Kelly permits AppleCare and AOS employees to include – without
question –10 minutes per day, in *addition* to the time reflected in their log-in and log-out reports,
to account for time spent on start-up and log-off tasks.  (*See, e.g.*, Tovar Decl. ¶ 6.)  Additionally,
Kelly's policies require that employees contact Kelly if logging on or off takes longer than five
minutes.  (*See, e.g.*, ECF No. 7-6 at 3 ("If I experience prolonged delays with the Mac computer
(more than 5 minutes for either boot-up or log-off), I will contact the KellyConnect Employee
Support line."); Turansky Decl. ¶ 53; Ex. 3 at 2 ("If I experience prolonged delays with the Mac
computer (more than 5 minutes for either boot-up or log-off), I will contact the I.T. Support
Desk.").)  After calling technical support as required, employees are required to note this call in

Kelly Web Time so that Kelly can compensate them properly.  (Tovar Decl. ¶ 7; ECF No. 7-5 at 2-3.)  AppleCare and AOS employees are required to report all time spent on the phone with Kelly technical support – for log-in and log-out problems or for any other technical support issues – as work time in Kelly Web Time.  (Tovar Decl. ¶ 8; ECF No. 7-5 at 3 ("if you cannot log into iLog due to a tech issue, you would put the hours on your time sheet and put a note that you were talking to the Help Desk or Attendance Line with the ticket number").)  In contrast, IT SC Agents, such as Opt-In Plaintiffs Papin and Burzycki, had no log-in or log-out report to review, or with which Kelly could verify their time.  (Turansky Decl. ¶ 48.)  Instead, they simply logged any time worked in Kelly Web Time.

Time entries made by AppleCare and AOS employees were reviewed by Payroll Attendance Coordinators.  (Tovar Decl. ¶ 1.)  If time entries were rejected time entries for any reason, the affected employee was notified of the rejection, and could contest it.  (*Id.* ¶ 9.)  If an AppleCare of AOS employee contested a rejection, corroboration of time worked from the employee's team leader is sufficient.  (*Id.* ¶ 9.)  In addition, Kelly employees were provided with a phone number "to report pay-related errors."  (Turansky Decl. ¶ 53; Ex. 1 at 3.)  Kelly employees could go back and request a time change at a later date.  (Tovar Decl. ¶ 10.)

**Different Schedules:**  Each Declarant alleges that their job with Kelly "regularly requires me to work 40 or more hours per week."  (*E.g.*, ECF No. 7-4 ¶ 5.)  However the actual time worked by the Declarants belies not only their individual claims regarding workweeks in excess of 40 hours, but also the notion that there exists a group of similarly-situated employees and that their workweeks are susceptible to collective-wide proof.

For example, in 15 of the 24 workweeks Declarant Truax worked for Kelly (*i.e.*, more than half), he worked fewer than 38 hours.  (Turansky Decl. ¶ 49.)  In 7 of the 15 weeks Declarant Ramsey worked for Kelly (*i.e.*, nearly half), she worked fewer than 38 hours.  (*Id.*

¶ 50.)  The time worked by the Opt-In Plaintiffs fares no better.  For example, in 33 of the 39 weeks Opt-In Plaintiff Williams worked for Kelly (*i.e.*, *more than 80%*), he worked fewer than 38 hours.  (*Id.* ¶ 51.)  And in 12 of the 21 weeks Opt-In Plaintiff Winfield worked for Kelly (*i.e.*, more than half), she worked fewer than 38 hours.  (*Id.* ¶ 52.)

**Different Technical Time Experiences:**  As to the critical question of whether there exists a population of "similarly situated" employees with regard to the issue of "technical support time," no Declarant alleges or even suggests with any specificity the frequency with which their "technical issues" occur, or the nature or duration of those "technical issues."

Most fundamentally, IT SC Agents – such as Opt-In Plaintiffs Papin and Burzycki – did not call the Kelly Help Desk at all.  (*Id.* ¶ 36)  As more advanced technical personnel, they provided their own technical support, their own equipment, and were not subject to any policy regarding time spent dealing with technical issues.  (*Id.*)

The Declarants do not attest whether and to what extent other employees experience "technical issues," but each asserts "[a]t periodic times both prior to or during my work shifts I am routinely disconnected from Defendants' computer systems and/or software programs/applications." (*E.g.*, ECF No. 7-4 ¶ 15.)  Even among the Declarants, however, there is fundamental disagreement about what they (and other employees) are allegedly required to do when "experiencing technical issues."  Five of the Declarants allege that: "Pursuant to Defendant's policies, I and other HBCCAs are required to place a telephone call to Defendant's technical support line when experiencing technical issues."  (*E.g.*, *id.* ¶ 15.)  Declarant Truax goes further, asserting that: "[he] and other HBCCAs are required *to shut down, restart and* place a telephone call to Defendant's technical support line when experiencing technical issues."  (ECF No. 41-5 ¶ 16 (emphasis added).)  Declarant Key goes further yet, stating that: "[she] and other HBCCAs are required *to get permission to shut down, restart and* place a telephone call to

Defendant's technical support line when experiencing technical issues."  (ECF No. 41-2 ¶ 16

(emphasis added).)  The three versions cannot all be true, and each misstates Kelly's policies.

Contrary to the Declarants' views, employees are *not* required to call the Kelly Help Desk

to deal with all technical issues.  (Anderson Decl. ¶ 7.)  Rather, employees are required to call the

Help Desk only when experiencing a technical issue which prevents them from working, such as

one involving the VPN or, that makes them unable to log into iLog.  (*Id.*)

Interactions with Kelly's Help Desk are tracked by "help tickets."  (*Id.* ¶ 8.)  There is

substantial variation among the Declarants with regard to the quantity of help tickets generated.

For example, Declarant Montreuil submitted 19 help tickets.  (*Id.* ¶ 9.)  On the other hand,

Plaintiff Gaffers submitted 51, and Declarant Sabot submitted 80.  (*Id.* ¶¶ 10, 11.)  There is more

variation among the Opt-In Plaintiffs.  IT SC Agents such as Opt-in Plaintiffs Papin and

Burzycki did not contact the Help Desk, and thus had no help tickets. (*Id.* ¶ 14.)  Opt-In Plaintiff

Lambert submitted 5 help tickets.  (*Id.* ¶ 12.)  Opt-In Plaintiff Costello submitted 121.  (*Id.* ¶ 13.)

The number of help tickets generated is entirely dependent on the individual employee,

the employee's computer and activity, and a myriad other individual technical factors, including,

for example, the employee's personal Internet Service Provider.  Employees' time spent

"experiencing technical issues" is thus not susceptible to collective-wide proof, and the variance

in help tickets generated demonstrates that with regard to this facet of Plaintiff's case theory,

there exists no population of "similarly situated" individuals.

**Different Reporting:**  Kelly's employees are responsible for reporting their time worked,

including log-in and log-off time.  If employees experience log-in or log-off time in excess of

five minutes, they are required to notify the Help Desk, and add a comment in Kelly Web Time.

In the previous 6 months, including the time since filing the instant Complaint, Plaintiff Gaffers

has *never* once noted excess log-in or log-off time in Kelly Web Time.  (Merced Decl. ¶ 10.)

**Arbitration Agreements:** Beginning in November of 2014, all new Kelly employees, including 10 of the 20 Opt-In Plaintiffs, were required to sign arbitration agreements. (ECF No. 25-13 ¶¶ 2-3.) After Kelly's Motion to Compel Arbitration was filed, Veronica Gardner filed a consent to "to join and act as a plaintiff." (ECF No. 28-2.) Plaintiff Gardner signed an arbitration agreement identical to those signed by the other Arbitration Plaintiffs. (Turansky Decl. ¶ 57.) In signing these arbitration agreements, employees agreed to arbitrate "all common-law and statutory claims relating to [their] employment." (ECF No. 25-14 ¶ 2.) They also agreed that all such claims would "be arbitrated only on an individual basis." (*Id*. ¶ 8.)

## PROCEDURAL BACKGROUND

On January 14, 2016, Plaintiff filed this lawsuit against Kelly, on behalf of himself and others who he alleges are similarly situated. (ECF No. 1.) On January 29, 2016, Plaintiff filed the instant motion to conditionally certify a collective action. (ECF No. 7.) Prior to filing the motion, Plaintiff's counsel did not meet and confer with Kelly or Kelly's counsel regarding the motion. (Maatman Decl. ¶ 8.)

## ARGUMENT

## I.    PLAINTIFF BEARS THE BURDEN OF DEMONSTRATING THAT CONDITIONAL COLLECTIVE ACTION CERTIFICATION IS APPROPRIATE

Section 216(b) of the FLSA enables an employee to bring a lawsuit against an employer for violations of the FLSA on behalf of himself and any other "similarly situated" individuals. 29 U.S.C. § 216(b). Granting conditional certification can result in "considerable cost to the parties and a court to go forward with a collective action," including, "at a minimum, the expense of sending out notice to the putative collective members, the substantial widening of discovery, and the burden on the courts of administering the [potentially] thousands of claims brought by opt-ins nationwide." *Salleen v. Waste Management, Inc.*, No. 08-CV-4959, 2009 WL 1664451, at *8 (D. Minn. June 15, 2009) (denying conditional certification). Courts recognize that

"[a]lthough the standard for granting conditional certification is lenient, it is not non-existent." *Cason v. Vibra Healthcare*, No. 10-10642, 2011 WL 1659381, at *3 (E.D. Mich. May 3, 2011); *see also Shipes v. Amurcon Corp.*, No. 10-14943, 2012 WL 995362, at *10 (E.D. Mich. Mar. 23, 2013) ("while Plaintiff's burden at this stage is not stringent, certification is by no means automatic"); *Perry v. Randstad General Partner (US) LLC*, No. 14-11240, 2015 WL 2237829, at *6 (E.D. Mich. May 12, 2015) (denying conditional certification "under the relatively lenient standard" where Plaintiffs had "not alleged facts suggesting that there are any other employees similarly situated . . . or that [the staffing company Defendant] has a policy or practice of denying non-exempt employees overtime.").  To decide Plaintiff's motion, the Court must: (1) determine if Plaintiff has met his burden of showing that conditional certification is appropriate, and (2) satisfy itself that the litigation is manageable as a collective action.  *See Frye v. Baptist Mem'l Hosp., Inc.*, No. 07-2708, 2008 U.S. Dist. LEXIS 107139, at *12 (W.D. Tenn. Sept. 16, 2008); *Gromek v. Big Lots, Inc.*, No. 10 C 4070, 2010 WL 5313792, at *3 (N.D. Ill. Dec. 17, 2010).

To meet this burden, Plaintiff must "submit evidence establishing at least a colorable basis for their claim that a class of 'similarly situated' plaintiffs exists."  *O'Neal v. Emery Federal Credit Union*, No. 1:13–CV–22, 2013 WL 4013167, at *5 (S.D. Ohio Aug. 6, 2013).  A plaintiff cannot meet his burden based solely on his allegations alone; "conditional certification should not be granted unless the plaintiff presents some evidence to support her allegations that others are similarly situated."  *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 868 (S.D. Ohio 2005); *see also Arrington v. Michigan Bell Tel. Co.*, No. 10-10975, 2011 WL 3319691, at *6 (E.D. Mich. Aug. 1, 2011) (Lawson, J.) ("conclusory allegations are insufficient to support conditional certification"); *Shipes*, 2012 WL 995362, at *11 (a plaintiff must prove that there is a reasonable basis to claim that there are other similarly-situated employees, and a plaintiff cannot

9

satisfy his or her burden with "unsupported assertions") (citation omitted).  Further, his evidence must be admissible; that is, he cannot rely on mere speculation, conclusory allegations, and hearsay.  *See Harrison*, 411 F. Supp. 2d at 865 ("only admissible evidence may be considered in connection with a § 216(b) motion").

Plaintiff's motion fails the test established by this case law, and should be denied.  *First*, while the Declarations submitted should be stricken or disregarded, even assuming their accuracy and admissibility, they make clear that Plaintiff has not and cannot demonstrate that a group of similarly situated workers exists.  In fact, the Declarations demand the *opposite* conclusion, demonstrating the insuperable and wide-spread variability of employees' experiences.  *Second*, trial of this matter as a collective action would be unmanageable, because the fact-finder will be required to conduct innumerable mini-trials to examine the minute-by-minute work experiences of thousands of employees across the country.  Moreover, based on their conduct thus far, Plaintiff and his counsel are inadequate to represent the members of the putative collective action.  *Third*, the Court can and should deny the motion out of hand, because it fails to comply with Local Rule 7.1 and this Court's Practice Guidelines.

## II.    CERTIFICATION OF A NATIONWIDE COLLECTIVE ACTION IS INAPPROPRIATE AS A MATTER OF LAW

### A.    The Court Should Strike Or Disregard The Declarations

As noted, Plaintiff seeks to certify a collective action of over 6,000 Kelly employees who worked remotely in at least 11 different positions in 48 states.  He does so based on his allegation that "Defendant maintain[s] a common scheme and policy of failing to pay wages for compensable pre-shift, technical issues, and post-shift activities."  (ECF No. 7 at 1.)  However, before a plaintiff may send notice to potential opt-in plaintiffs, he must present "at least a colorable basis for their claim that a class of 'similarly situated' plaintiffs exists."  *O'Neal*, 2013 WL 4013167, at *5.  A plaintiff cannot satisfy his burden with unsupported allegations of a

policy or practice of violating the FLSA.  *See id.* at *8 ("While the evidentiary threshold for demonstrating that similarly situated employees exist is not high, a plaintiff must demonstrate a factual nexus – that is, something more than mere allegations – to warrant conditional certification and the delivery of notice to potential class members.").

Here, the Declarations fail to satisfy his burden.  To meet his burden that the individuals he seeks to represent are similarly situated to conditionally certify a case as a § 216(b) collective action, Plaintiff must point to admissible evidence.  *See Harrison* 411 F. Supp. 2d at 865-66; *see also Arrington*, 2011 WL 3319691, at *6.  The Declarations do not meet this standard because they simply assume "knowledge" regarding the time records or paystubs of other putative collective action members, the compensation that Kelly paid to these other employees, the amount of pre-shift and post-shift work performed in connection with the activities" by these employees, or Kelly's interaction with thousands of employees.  For example, the Declarations make the following identical statements which are not – and could not be plausibly – based on personal knowledge:

> I and other HBCCAs are only paid a per shift maximum of 10 minutes for the work we perform in connection [sic] pre-shift start-up and log-in and post-shift shutdown and log-out functions. (*E.g.*, ECF No. 7-4 ¶ 11.)

> Defendant knows that myself and other hourly HBCCAs regularly work off-the-clock because it provides us training with respect to how to start-up/log-in prior to each shift, how to disconnect/reconnect to the software programs during our shifts, and how to log-out of the various programs/software subsequent to each shift.  (*E.g.*, *id.* ¶ 20.)

In addition, Plaintiff's Declaration makes the following statements[3] which are not – and could not be plausibly – based on personal knowledge:

> Accordingly, Defendant fails to pay me and other HBCCAs for no less than 3 to 10 minutes per day of work performed in connection with the pre-shift and post-shift activities. (*Id.* ¶ 12.)

---
[3]    Nearly identical statements appear in all other Declarations.

11

> Consequently, Defendant fails to pay me and its HBCCAs' [sic] for: (a) Time
> spent on hold waiting to speak to a member of Defendant's technical support team
> – which often takes 10 to 15 minutes or longer; (b) Time spent waiting for a return
> call from a member of Defendant's technical support team – which often takes 3
> to 4 hours or longer; (c) Any time spent dealing with the technical issue that
> exceeds 1 hour; and (d) Time spent performing start-up and log-in procedures
> once the technical issue is resolved.  (*Id.* ¶ 18.)

"[A]ffidavits submitted at the notice stage must be based on [ ] personal knowledge . . .

otherwise, [they] would not be any more probative than the bare allegations in the complaint, and

the requirement of factual support would be superfluous."  *White v. MPW Indus. Servs.*, No.

1:05-CV162, 236 F.R.D. 363, 369 (E.D. Tenn. 2006); *see also Shipes,* No. 10–14943, 2012 WL

995362, at *11 (E.D. Mich. Mar. 23, 2012) (denying conditional certification where "[h]er bare-

bones affidavit states only, 'I know of other individuals who regularly worked overtime hours for

Amurcon. . . . ' She does not even say whether these other, unspecified individuals were paid for

their hours of overtime."); *Boyd v. Alutiiq Global Solutions, LLC*, 11-CV-0753, 2011 WL

3511085, at *6 (N.D. Ill. Aug. 8, 2011) (denying conditional certification where "[a]t best, those

declarations establish that four employees at the same location were told that Alutiiq does not

pay overtime and that . . . three [declarants] determined that Alutiiq's pay practices [were]

'consistent' with other locations after talking to unidentified employees").

There is no personal knowledge supporting the above-quoted statements, because they are

replete with guesswork as to the experiences of unidentified, nameless employees across

thousands of disparate geographic locations.  *See, e.g.*, *Goldfaden v. Wyeth Labs., Inc.*, No. 08-

10944, 2010 WL 2011310, at *8 (E.D. Mich. May 19, 2010), *aff'd*, 482 F. App'x 44 (6th Cir.

2012) ("to the extent Plaintiff's affidavit includes information based on her beliefs . . . she lacks

foundation and personal knowledge on those matters, and it should be excluded").

In a similar vein, the Declarations should be stricken or disregarded because they recite

in unduly generalized, vague, and conclusory terms the factual conclusions Plaintiff wishes this

Court to reach, and because they contain inadmissible hearsay. Each Declaration fails to explain

any facts to support the Declarant's general assertions regarding the circumstances and job

responsibilities of other putative collective action members, Kelly's records regarding other

employees, or practices that Kelly supposedly applied to other putative collective action

members. Most notably, the Declarations do not specify the names of any other employees to

which each declarant supposedly spoke,[4] and to the extent they purport to convey the contents of

any such conversations, contain inadmissible hearsay. For example, each Declarant states:

> The tasks I and other HBCCAs perform in connection with these pre- and post-shift activities are required by Defendant and are an essential part of my job responsibilities as a HBCCA." (*E.g.*, ECF No. 7-4 ¶ 13.)

> During my employment with Defendants, I have gotten to know other hourly HBCCAs and become [sic] familiar with their job responsibilities. These individuals perform the same or similar job duties as I do and also work off-the-clock time each day, including overtime, without being compensated properly. From my experiences, I know that all hourly HBCCAs are subjected to the same practices and procedures and that all of us lost wages because we were not paid properly. I know that, if given the opportunity, these individuals would participate in a lawsuit to recover unpaid compensation." (*E.g.*, *id*. ¶ 22.)

As this Court has held, such parroting of the factual conclusions that Plaintiffs want this

Court to reach cannot support collective action certification. *See Arrington*, 2011 WL 3319691,

at *6 (J. Lawson) (denying conditional certification in part because "they provide nothing more

than conclusory allegations"). Moreover, the Declarations should be stricken or disregarded

because they contain sweeping, generalized assertions regarding the purported practices and

experiences of scores of unnamed individuals, and those assertions are grounded in hearsay.

They are offered for the truth of the matter asserted: *i.e.,* that Kelly allegedly does not properly

compensate all of its employees in violation of the FLSA; and they are based on out-of-court

---

[4] Despite claiming that they each have "gotten to know other hourly HBCCAs and become familiar with their job responsibilities," the Declarants fail to identify any.

13

statements by individuals who remain unidentified.  Accordingly, these statements are inadmissible and should be stricken or disregarded.  *See Harrison,* 411 F. Supp. 2d at 865-67.

Even if they were admissible (which they are not), the Declarations do not support certification of the nationwide collective action Plaintiff proposes.  Courts have routinely refused to conditionally certify nationwide collective actions based on allegations from a limited number of plaintiffs with limited or no exposure to individuals working at other locations.  *See, e.g.*, *O'Neal*, 2013 WL 4013167, at *10-11 (denying conditional certification where plaintiff provided no factual foundation regarding hours worked by 376 other loan officers who reported to 61 managers across 35 states); *Guillen v. Marshalls of MA, Inc.*, No. 09 Civ. 9575, 750 F. Supp. 2d 469, 477 (S.D.N.Y. 2010) (finding that declarations from five plaintiffs at nine stores "provides little basis to believe that [plaintiff] is similarly situated to [potential plaintiffs] throughout the country"); *West v. Border Foods, Inc.*, No. 05-2525, 2006 WL 1892527, at *9 (D. Minn. June 12, 2006) (finding "limited sampling" of 6 of 240 shift managers – 2.5 per cent of the potential class – "does not support the Plaintiffs' assertion of widespread violations").

This case is similar to *O'Neal*.  There, three plaintiffs claimed that defendants failed to pay them and a nationwide class of loan officers minimum wage or overtime.  *O'Neal*, 2013 WL 4013167 at *1-2.  The court denied conditional certification, holding that: "Defendants' evidence . . . does not diminish Plaintiffs' statements to the contrary.  However, given that Plaintiffs have no evidence other than their own limited experience with respect to hours worked and compensation paid, there is not enough information to support a finding that Defendants have a company-wide policy of violating the FLSA."  *Id.* at * 5, 7, 11.

**B.     Plaintiff Is Not Similarly Situated To The Other Putative Collective Action Members**

Even if the Declarations were admissible and accurate (which they are not), Plaintiff still has not shown that he is similarly situated to the other putative collective action members.  In

support of his argument that he is similarly situated to all of these workers, Plaintiff points to two things: (1) purported unpaid overtime for pre-shift and post-shift work; and (2) purported unpaid overtime for time spent dealing with mid-shift technical issues.  (ECF No. 7 at 1.)  But even assuming the accuracy of the Declarations, Plaintiff has not shown that he is similarly situated to the other *Declarants* – let alone the other putative collective action members – under either theory, because the Declarations contain irreconcilable variations.

### 1.    Logging-In: Not Similarly Situated

Each Declaration alleges that "[p]rior to each shift . . . [the Declarant is] required to start-up and log-in to various secure computer programs, software programs, servers and applications, in order to access information and software."   Each Declaration lists the steps allegedly required to be taken "prior to each shift," and lists the "various computer programs, software programs, applications and servers" which must allegedly be "[o]pen[ed], logg[ed] into, and connect[ed] to . . . ."  (*See, e.g.*, ECF No. 7-4 ¶ 7.)  A comparison of the daily log-in steps allegedly required and the "various computer programs, software programs, applications and servers," which must allegedly be accessed each day is telling.

In total, the seven Declarants list 35 unique steps that must allegedly be taken and/or programs that allegedly must be accessed each day.  (*See* Maatman Decl. ¶ 9, Ex. 5.)  Of the 35 unique steps and/or programs, the Declarants agree on just ***three***: (1) "Starting my computer"; (2) "Joining any applicable chat rooms (pod chats)"; and (3)  iLog. (*See id.*).

The remaining 32 unique steps that must allegedly be taken and/or programs that allegedly must be accessed demonstrate a profound variability.  For example, Plaintiff Gaffers claims that each day he is required to "[o]rganize programs in a manageable way to improve efficiency throughout my shift" and "Clear[] 'Bullet News'."  (ECF No. 7-4 ¶ 7.)  No other Declarant alleges needing to do either.  Plaintiff Gaffers also claims that each day he is required

15

to access: (1) "TirageBoard" [sic]; (2) Gather; (3) GBI Portal; (4) Messages; (5) MonsterBoard; and (6) Notes. No other Declarant asserts they are required to access *any* of these six programs. Four Declarants assert they are required to access Jabber each day, and three do *not* so assert. (*See* Maatman Decl. ¶ 9, Ex. 5.) Three Declarants claim they are required to access PeopleNet each day, while four make no such claim. (*Id.*) Just two of the seven Declarants assert being required to "[r]eview[] emails for projects updates and announcements" each day. (*Id.*) Only two Declarants claim they are required to access: (1) Apple Connect; (2) iDesk; (3) Microsoft Outlook; (4) Office 365; (5) Pipkins; and/or (6) VPN. (*See id.*) Perhaps most tellingly, for *23 of the 35* unique steps that Declarants claim must be taken and/or programs that Declarants claim must be accessed each day, only *one Declarant of the seven* alleges needing to take the step or access the program. (*See id.*)

Given the almost complete lack of uniformity concerning the log-in process, it is unsurprising that the Declarations evince markedly different estimates of the amount of time required to log-in. Declarant Ramsey claims it takes as little as 5 minutes to log-in each day. (ECF No. 41-3 ¶ 8.) Declarant Rhymer, however, avers that logging-in takes as much as *2 hours each day*. (ECF No. 49-3 ¶ 8.) ***None*** of the Declarants agree on the estimated time to log-in. (*See* Maatman Decl. ¶11, Ex. 7.)

With regard to whether even the Declarants (let alone the entire employee population) are "similarly situated," the Court need look no further than the patent variations in the Declarations themselves. By their own admission, the Declarants differ in more ways than they are alike.

### 2. Logging-Out: Not Similarly Situated

Each Declaration also alleges that: "[a]fter each shift . . . [the Declarant is] required to shutdown and log-out of various secure computer programs, software programs, servers and applications, in order to access information and software." Each Declaration lists the steps

allegedly required to be taken "after each shift," and lists the "various computer programs, software programs, applications and servers" which must allegedly be "[o]pen[ed], logg[ed] into, and connect[ed] to . . . ." (*See, e.g.*, ECF No. 7-4 ¶ 9.) A review of the daily shutdown steps allegedly required and the "various computer programs, software programs, applications and servers" that allegedly must be logged-out of each day is equally telling.

The Declarants list 32 unique steps that allegedly must be taken and/or programs that allegedly must be exited each day. (*See* Maatman Decl. ¶ 10, Ex. 6.) Of the 32 unique steps and/or programs, the Declarants agree on just ***two***: (1) "Shutting down my computer"; and (2) "Quitting, disconnecting, shutting down and logging out of . . .iLog." (*See id.*)

For 22 of the 32 unique steps that Declarants claim must be taken and/or programs that Declarants claim must be exited each day, only *one Declarant of the seven* avers needing to take the shutdown step or exit the program. (*See id.*) That the programs that allegedly must be exited demonstrate variability is unsurprising, given the dearth of agreement about which programs must be accessed. However, the differences with regard to the unique steps that allegedly must be taken to shutdown "at the end of each shift" demonstrate irreconcilable inconsistency among the Declarants, even setting aside the variability with regard to the allegedly required software. For example, Plaintiff Gaffers claims that each day he is required to "[m]anually record[] time entry in PeopleNet and cross check[] with GBI's Login-Logout (LILO) report for errors." (ECF No. 7-4 ¶ 7.) No other Declarant asserts being required to do so. Declarant Montreuil claims that each day she is required to "respond[] to surveys, customer email, and close[] out cases." (ECF No. 4-2 ¶ 9.) No other Declarant avers being required to do so. (*See* Maatman Decl. ¶ 10, Ex. 6.) Declarant Truax claims that each day he is required to "review[] updates to ensure proper installation, and if not properly installed, contacting tech support with said time ranging from 1 to

2 hours." (ECF No. 41-5 ¶ 9.)  No other Declarant mentions reviewing updates or verifying their installation, let alone on a daily basis. (*See* Maatman Decl. ¶ 10, Ex. 6.)

Setting aside the programs that allegedly must be exited, the only alleged post-shift task Declarants agree on is "[s]hutting down [their] computer." (*See id.*)  Importantly, there is actually no such requirement; in fact, Kelly employees are *not* required shut their computers down each night. (Anderson Decl. ¶ 5.)

It is thus unsurprising that, just as was the case for the Declarants' estimates regarding log-in time, there is no consistency regarding estimated log-out time.  For example, Plaintiff Gaffers claims it takes as little as 3 minutes each day to log-out. (ECF No. 7-4 ¶ 10.)  Declarants Truax and Rhymer, however, swear that on a daily basis, logging-out takes as much as *2 hours*. (ECF No. 41-5 ¶ 10; ECF No. 49-3 ¶ 8.)  Again, **_none_** of the Declarants agree on their estimated time to log-out. (*See* Maatman Decl. ¶ 11, Ex. 7.)

The wide variation among the Declarants with regard to their supposed daily shutdown requirements and timing further underscores that, by their own admissions, even the Declarants (let alone the entire employee population) are not "similarly situated."

### 3.    Entering Time: Not Similarly Situated

Plaintiff claims that he and potential opt-ins are similarly situated because he alleges that all were subject to a policy by which they were only compensated for 10 minutes of time spent before and after the time indicated on their Log In/Log Out Report. (ECF No. 7 at 7, 10.)  Yet, even assuming that Plaintiff himself was subject to such a policy – and he was not, *see* Turansky Decl. ¶ 45; ECF No. 7-6 at 3 ("I will record my time worked including computer boot-up and log-off time")) – other potential collective action members could not have been subject to this policy because they either did not enter their time or had no Log In/Log Out Report.  AppleCare Team Leads, such as Plaintiff Armistead, were exempt. (Turansky Decl. ¶¶ 20, 34.)  IT SC

Agents, such as Plaintiffs Papin and Burzycki, had no Log In/Log Out Report.  (*Id.* ¶ 48.)  Thus, the allegations regarding could not apply to Plaintiffs Armistead, Papin, or Burzycki.

### 4.      Technical Support: Not Similarly Situated

Plaintiff alleges that members of the putative collective action called technical support without compensation.  (*See* ECF No. 1 ¶¶ 4, 18, 23.)  Tellingly, Plaintiff himself does not allege any instance in which he called technical support without receiving compensation.  (*See* ECF No. 26-1 at 7-9; ECF No. 7-4 ¶¶ 14-17.)  This is for good reason.  As Plaintiff himself admitted on November 23, 2015, he did not call the Kelly Help Desk when to deal with technical issues – despite his allegation that such a call was required (*see* ECF No. 7-4 ¶ 16) – but instead fixed the issue himself and noted the time on his time card. According to Plaintiff Gaffers, "when stuff breaks, it breaks. [I] fix it on my own, and [I] put the note in my time card."  (Anderson Decl. ¶ 17.)  So, even if other potential opt-ins had a claim for unpaid technical support time, Plaintiff has not presented evidence that he has such a claim, and has tacitly admitted that he does not.  For these reasons, he is not "similarly situated" to others he seeks to represent.

### 5.      Arbitration Agreements With Collective Action Waivers: Not Similarly Situated

Beginning in November 2014, all new Kelly employees were required to sign arbitration agreements that contained collective action waivers.  (ECF No. 25-13 ¶¶ 2-3.)  Arbitration agreements have been signed by half of the Opt-In Plaintiffs here.  (*See* ECF No. 25-1 at 4-5 (listing nine Arbitration Plaintiffs) & Turansky Decl. ¶ 57 (Opt-In Plaintiff Gardner Arbitration Agreement).)  Plaintiff Gaffers, who did not sign an agreement, is not similarly situated to such putative collective members, because they cannot participate even if it is conditionally certified, and because it would be a waste of resources to invite such individuals to temporarily join this lawsuit.  *See Longnecker v. American Express Co.*, No. 14-CV-69, 2014 WL 4071662, at *7 (D. Ariz. Aug. 18, 2014) (declining to send notice to potential opt-ins hired after date company had

all new hires sign an arbitration agreement since "there [was] no reason to give notice to any employee hired on or after" that date); *Fischer v. Kmart Corp.*, No. 13-CV-4116, 2014 WL 3817368, at *7-8 (D.N.J. Aug. 4, 2014) (denying conditional certification for potential opt-ins who signed collective action waivers because such potential opt-ins were "not similarly situated to members who can arbitrate in a collective action"); *Adami v. Cardo Windows, Inc.*, No. 12–2804 (JBS/JS), 299 F.R.D. 68, 81 (D.N.J. 2014) (excluding individuals who signed arbitration agreements at the conditional certification stage because they were not similarly situated).

### C.    Collective Action Certification Should Be Denied: Manageability And Adequacy

Plaintiff's motion fails to address the issue of manageability.  Because trial of Plaintiff's proposed case would be unmanageable, the Court should deny conditional certification.  *See Gromek v. Big Lots, Inc.*, No. 10-CV-4070, 2010 WL 5313792, at *5 (N.D. Ill. Dec. 17, 2010) (declining first-stage conditional collective action certification based on manageability concerns even where plaintiffs showed they were similarly situated).

To resolve the Opt-Ins' claims and determine their entitlement to overtime, the Court will have to conduct a series of fact-specific, individualized inquiries to analyze the practices and experiences of each collective action member, on a computer-by-computer, day-by-day, minute-by-minute basis for log-in, log-out and technical support time.  And, assuming liability (which Kelly denies), the Court will have to consider the weekly hours worked by each of more than 6,000 potential collective action members throughout the liability period to determine the amount, if any, of overtime owed.  *See Espenschied v. DirectSat USA, LLC*, No. 12–1943, 705 F. 3d 770, 775 (7th Cir. 2013) (affirming denial of certification in a hybrid collective action because plaintiffs worked varying hours on different schedules).

Plaintiff's claim – and each employee's purported claim – rises and falls on circumstances unique to him, including (i) whether he followed Kelly's policies and procedures

(if he did, he would have been paid for much or all of the time he claims he was not compensated for); (ii) the hardware and software he used; (iii) whether and to what extent he needed technical support; (iv) the time it took him to log in and log out; (v) whether he worked 40 hours or more in a week; and (vi) whether he has signed an arbitration agreement requiring him to pursue an claim in an individual arbitration. The Court will not be able assess these unique circumstances collectively, and thus will be unable to assess liability or damages on a collective basis. Instead, this case will require an unmanageable series of mini-trials and, therefore, is inappropriate for certification. *See Pullen v. McDonald's Corp.*, Nos. 14-11081 & 14-11082, 2014 WL 4610296, at *2 (E.D. Mich. Sept. 15, 2014) (denying conditional certification where, "at the post-discovery stage, it is almost certain that the court ultimately would find the plaintiffs are not similarly situated"); *see also Salleen*, 2009 WL 1664451, at *8 (denying conditional certification due to "considerable variation" in the evidence regarding the putative collective action, leaving the Court "with the clear impression that this case would not be more orderly and sensibly managed as a nationwide collective action.").

Moreover, although the requirements of Rule 23 are generally inapplicable to FLSA collective actions, adequacy of representation is relevant to this Court's § 216(b) analysis. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, No. 14–1146, 136 S. Ct. 1036, 1045 (2016) ("the standard for certifying a collective action under the FLSA is no more stringent than the standard for certifying a class under the Federal Rules of Civil Procedure"); *White v. Osmose, Inc.*, No. 01–A–877–N, 204 F. Supp. 2d 1309, 1315 (M.D. Ala. 2002) ("FLSA collective actions are representative actions, and, given that individuals who 'opt-in' to this proceeding will most likely be represented by the named-plaintiff's counsel, the court has an equitable interest in ensuring that they are adequately represented.") (citation omitted). In circumstances such as these, where "the class representative's claim is extremely weak, this is an independent reason to doubt the

21

adequacy of his representation . . . ." *Robinson v. Sheriff of Cook County*, No. 98–2333, 167 F.3d 1155, 1157 (7th Cir. 1999).  Thus, "[o]ne whose claim is a loser from the start knows that he has nothing to gain from the victory of the class, and so he has little incentive to assist or cooperate in the litigation; the case is then a pure class action lawyer's suit."  *Id.*  The situation is no different here.  Plaintiff Gaffers and his counsel are inadequate.

As the Court is aware, since January 20, Plaintiffs' counsel has been engaged in communications with potential opt-ins via their Facebook page and blog, stating as a fact (rather than an allegation) that Kelly failed to pay call center employees for off the clock work, and encouraging employees to join this suit.  (*E.g.*, ECF No. 27-1 at 9.)  These communications are improper *de facto* notice, *see* Maatman Decl. ¶ 6, Ex. 3 at 1, and in the notice context, courts have rejected such uses of social media.  *See, e.g.*, *Mark v. Gawker Media LLC*, No. 13 Civ. 4347, 2015 WL 2330079, at *1 (S.D.N.Y. March 5, 2015) (rejecting use of Facebook for notice as "overbroad," because the "attempts to send public-facing notices . . . rather than direct messages . . . cease to parallel the other forms of [permissible] notice"); *see also Bodner v. Oreck Direct, LLC*, No. C 06-4756, 2007 WL 1223777, at *2 (N.D. Cal. April 25, 2007) ("[P]laintiff's counsel, and not plaintiff, is the driving force behind this action.  Such a 'cart before the horse' approach to litigation is not the proper mechanism for the vindication of legal rights.") (citations omitted).  Due to the unauthorized nature of these communications, counsel for Kelly sought to convince Plaintiff's counsel to cease & desist with communications via Facebook and blog posts.  (Maatman Decl. ¶ 6, Ex. 3.)  Plaintiff refused and declined to comply with the Federal Rules.  (*See, e.g.*, ECF No. 44.)  Commenting on the Facebook post of Plaintiff's counsel, Plaintiff Gaffers himself stated:

> This is in relation to the KellyConnect Work at home program, and not any other division or entity of Kelly Services.  This case is in relation to unpaid overtime in relation to start up and log off procedures (beyond the 5 minutes) and not paying

> for technical downtime, such as waiting on hold speaking with the help desk or
> other times when disconnected from the system intermittently throughout the day.

(*Id.* ¶ 6, Ex. 4.)  Plaintiff's statement was since removed from his lawyer's site.  (*Id.*)  In response to the Facebook post of Plaintiff's counsel, Kelly employee James Clarke stated: "What the hell?! None of this is true."  (*Id.* ¶ 4, Ex. 1 at 5.)  And Linda Hermeneanu stated: "Don't believe this.  I've only witnessed a company with integrity . . . ."  (*Id.* ¶ 4, Ex. 1 at 6.)  Numerous other unprompted social media posts by Kelly employees specifically refute Plaintiff's allegations and motivations in detail.  (*Id.* ¶ 4, Ex. 1.)[5]

Given Plaintiff's identical pursuant claims against Sitel and Kelly through the same lawyers, he appears to be a serial litigant, as evidenced by his carbon-copy filings with this Court.  (*E.g.*, ECF No. 25-1 at 1.)  Taken together, the conduct of Plaintiff and Plaintiff's counsel weigh against Plaintiff's ability to adequately pursue claims on behalf of the putative collective action.

### D.    Local Rule 7.1 Requires Denial Of Plaintiff's Motion

As a further matter, the Court should deny Plaintiff's motion for conditional certification because Plaintiff failed to confer with Kelly as required by both the Local Rules and this Court's Practice Guidelines.  Under Local Rule 7.1(a)(1), before filing any motion, "[t]he movant must ascertain whether the contemplated motion . . . will be opposed."  Local Rule 7.1(a)(2) further

---

[5] For example, Ivelisse Rivera-Williamson stated: "I work for Kelly services now..and I never had a problem with my pay.."  (*Id.* at 1.)  Patricia Keller stated: "This is so not true.  I'm at [sic] at-home advices for Kelly Services and have been for 2 1/2 years.  I have been paid for every minute i work, no prob. . . . You can sign in 5 minutes early, and sign out 5 mins later than you actually work to compensate for signing in and out of programs, It does NOT take 10 mins to sign in or disconnect from [sic] the end of the day."  (*Id.* at 3.)  Taylor Putnam stated: "Who the heck thinks it takes 20 minutes to get logged in and all the programs up and running? 10 minutes for these tasks is pretty generous . . . ."  (*Id.* at 4.)  Mr. Clarke continued: "As a senior advisor i have a handful of systems to open in addition to what tier one has. Even with my extra systems it takes no more than 4 to 6 minutes to load up from a complete shut down and I load 2 computers. It only takes 2 mins max to shut down at the end of the day. That only equates to 8 mins, but they pay you for 10."  (*Id.* at 5.)

23

requires that movants who are unable to obtain a concurrence must state that they either

conferred with the other party, or were unable to conduct a conference.

> The Court requires that a good-faith effort be made to obtain concurrence, which
> normally involves actual contact with opposing counsel.  If no actual conversation
> occurs, the moving party must show that reasonable efforts were undertaken to
> conduct a conference and *specifically describe those efforts in the motion papers.*
> The outcome of the conference must be stated. *All of this must be documented*
> *specifically in the motion papers.*

Judge David M. Lawson Practice Guidelines, Motion Practice (emphases added).

It is beyond dispute that Plaintiff did not seek Kelly's consent prior to filing his motion

for conditional certification.  (Maatman Decl. ¶ 8.)  Plaintiff should have done so, because, in

conferring, Plaintiff would have learned of the many previously-discussed flaws in his proposed

collective action.  Regardless, Plaintiff provides no basis justifying his failure to confer with

Kelly.  (*See* ECF No. 7.)  The fact that Kelly subsequently did not consent to the motion after it

was filed does not excuse Plaintiff's failure to follow the rules.  *See Little Caesar Enters., Inc. v.*

*Divine Commercial Enters.*, No. 11-CV-13163, 2011 WL 3235475, at *2 (E.D. Mich. July 28,

2011) (Lawson, J.) ("Although it is uncertain whether the defendants would agree to such relief

while the lawsuit is pending, it is incumbent on the plaintiffs to ascertain whether the relief can

be obtained without court intervention.  The plaintiffs have made no effort to do so.  'It is not up

to the Court to expend its energies when the parties have not sufficiently expended their own.'")

(citation omitted).  Additionally, Plaintiff cannot credibly claim that he was unaware of who

represented Kelly before filing his motion, as counsel for Kelly sent him a letter regarding this

case on January 23, 2016.  (Maatman Decl. ¶ 6.)  Moreover, Plaintiff could have conferred with

Kelly itself, as the Local Rule requires a conference with the other party, not necessarily its

counsel.  In sum, Plaintiff flouted disregarded the Local Rules and this Court's Practice

Guidelines, and has no legitimate excuse for doing so.

24

The Court's Practice Guidelines state that failure to seek a concurrence "likely will result in a denial of the motion."  The Court denies motions on this basis, *see, e.g.*, *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, No. 11-CV-1845749, at *3 (E.D. Mich. Apr. 30, 2013), and should do so here, especially because Plaintiff's failure resulted in numerous potentially-avoidable disputes.

## III.   TWO FORMS OF NOTICE IS INAPPROPRIATE

Even if, counter-factually, Plaintiff had evidence to support conditional certification, the Court should reject Plaintiff's proposal to send out two forms of notice.  Sending two forms of notice, as Plaintiff proposes, would be inappropriate because "reminder notice [is] unnecessary and potentially could be interpreted as encouragement by the court to join the lawsuit." *Wlotkowski v. Mich. Bell Tel. Co.*, No. 09–11898, 267 F.R.D. 213, 220 (E.D. Mich. 2010); *see also Knispel v. Chrysler Grp. LLC*, No. 11–11886, 2012 WL 553722, at *8 (E.D. Mich. Feb. 21, 2012).  "The purpose of notice is simply to inform potential class members of their rights. Once they receive that information, it is their responsibility to act as they see fit."  *See, e.g.*, *Wlotkowski*, 267 F.R.D. at 220.  Thus, "[c]ourts generally approve only a single method for notification unless there is a reason to believe that method is ineffective."  *Wolfram*, 2012 WL 6676778, at *4.  The Court, therefore, should reject Plaintiff's request for e-mail notice.

DATED:  April 22, 2016

KELLY SERVICES, INC.

By:  *s/ Gerald L. Maatman, Jr.*
        Gerald L. Maatman, Jr.

Gerald L. Maatman, Jr., IL No. 6181016
(gmaatman@seyfarth.com)
Peter J. Wozniak, IL No. 6294133
(pwozniak@seyfarth.com)
Christopher M. Cascino, IL No. 6296046
(ccascino@seyfarth.com)
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois  60603
Facsimile:      (312) 460-7000

William B. Forrest III
(wforrest@kohp.com)
Kienbaum Opperwall Hardy & Pelton, P.L.C.
280 North Old Woodward Avenue, Suite 400
Birmingham, Michigan 48009
Phone:  248-645-0000
Fax:  248-723-1110

*Attorneys for Defendant*

25

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he served a copy of the foregoing Defendants'

RESPONSE IN OPPOSITION TO PLAINTIFF'S PRE-DISCOVERY MOTION FOR

CONDITIONAL CLASS CERTIFICATION AND COURT-SUPERVISED NOTICE

PURSUANT TO 29 U.S.C. § 216(b) on the following through the Court's electronic case filing

system on this 22nd day of April 2016:

> Jason J. Thompson
> Kevin J. Stoops
> Jesse L. Young
> Sommers Schwartz, P.C.
> One Towne Square
> Suite 1700
> Southfield, Michigan 48076
> 248-355-0300
> jthompson@sommerspc.com
> kstoops@sommerspc.com
> jyoung@sommerspc.com

> s/ Gerald L. Maatman, Jr.
> _____
> Gerald L. Maatman, Jr.