UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN GAFFERS,

                 Plaintiff,                            Case Number 16-10128

v.                                                 Honorable David M. Lawson

KELLY SERVICES, INC.,

                 Defendant.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR
CONDITIONAL CERTIFICATION OF COLLECTIVE ACTION AND DENYING
DEFENDANTS' RENEWED MOTION TO STAY AND COMPEL ARBITRATION**

      Plaintiff Jonathan Gaffers is employed by defendant Kelly Services, Inc. as a home-based call center agent. He filed this action under the Fair Labor Standards Act (FLSA) alleging that Kelly is not paying him for the time it takes for him to log on to Kelly's computer applications so he can perform his job, and for certain other time spent solving technical connection problems, all of which extends his total work time beyond 40 hours during most weeks. He, along with 20 other potential opt-in plaintiffs, seeks to conditionally certify the case as a collective action and notify hundreds of other similarly situated employees of their right to opt in to the lawsuit. Kelly has offered several reasons why the collective action should not be certified, and it also moves to stay the case because all of its employees since November 2014 have signed an agreement to give up their rights under the FLSA to prosecute or participate in a collective action; instead, Kelly contends, they must arbitrate any employment disputes on an individual basis. The parties have briefed both motions thoroughly, and the Court finds that the motion papers adequately set forth the relevant facts and law, so oral argument will not aid in the disposition of the motions. Therefore, it is **ORDERED** that the motions be decided on the papers submitted. *See* E.D. Mich. LR 7.1(f)(2).

Over 70 years ago, the Supreme Court held that an employer cannot force an employee to give up the rights that Congress granted under the FLSA. And much more recently, the Sixth Circuit has held that those non-waivable rights include the right to participate in a collective action. Because the pertinent sections of Kelly's employment contract, phrased as an arbitration provision, force employees to waive their non-waivable FLSA right to a collective action, those sections are illegal and unenforceable. Therefore, Kelly's motion to stay the case and compel arbitration will be denied. And because the plaintiff easily has satisfied the minimal showing necessary for conditional certification, the Court will grant the motion to conditionally certify the case as a collective action.

## I. Facts

According to its website, Kelly and its subsidiaries "offer a comprehensive array of outsourcing and consulting services as well as world-class staffing on a temporary, temporary-to-hire, and direct-hire basis." Kelly says that it furnishes more than one million contract workers worldwide, employing about half that number, with the remaining workers engaged by its "supplier partners." As it relates to this case, Kelly "offers call center services through a program called KellyConnect, which is a comprehensive call center solution for its customers." Kelly employs workers as call center agents for the KellyConnect program in different settings, but most of its call center agents are employed via a "virtual call center" arrangement, where they work from their homes.

Plaintiff Jonathan Gaffers has worked for Kelly as a home-based call center agent since June 2014 at an hourly wage ranging from $10 to $11 per hour. At the start of each work shift, Gaffers says he must activate his computer and log in to various secure servers and applications, which takes

him from 10 to 15 minutes per day.  At the end of his shift, Gaffers must spend three to five minutes shutting down and logging out of those same computer systems and applications.  However, Kelly has a policy by which it pays its home-based call center agents for no more than a total of 10 minutes per day for time spent on the startup and shutdown activities.  Gaffers contends, therefore, that he is required to work between 3 and 10 minutes each day for which he is not paid.  He also alleges that during the workday he will sometimes be disconnected from the virtual call center systems, and he then is required to place a telephone call to Kelly's technical support department to restore his access to the services.  He sometimes is required to wait on hold for 10 to 15 minutes to speak to technical support staff, or to wait up to three or four hours for a return phone call.  However, Kelly has a policy by which it pays its call center agents only for time spent actually speaking to technical support staff, and it limits payment for time spent dealing with technical problems to no more than one hour per day.

Gaffers attached to his complaint two pay statements showing that he was paid for 40 hours at his regular wage and 0.46 hours of overtime in the first week, and for 40 hours at his regular wage with 0.70 hours of overtime in the second week.  He alleges that in these same weeks he should have been paid for between 15 and 60 minutes of overtime work that he spent logging into and out of the virtual call center systems, and that he also should have been paid additional overtime wages for unpaid time spent dealing with technical issues.

It appears to be undisputed that all of the members of the prospective class were employed as call center agents in various units of Kelly's "AppleCare" program.  Kelly asserts that the program employs more than 6,000 employees working under 11 different job titles across 48 states.  According to Kelly, the 11 job titles that members of the class worked under were: "(1) AppleCare

Tier 1 Advisors; (2) AppleCare Tier 1 Chat Advisors; (3) AppleCare Tier 2 Advisors; (4) AppleCare Tier 2 Chat Advisors; (5) AppleCare Tier 1 CPU/Mac+ Advisors; (6) AppleCare Tier 1 CPU/Mac+ Chat Advisors; (7) AppleCare Tier 2 CPU/Mac+ Advisors; (8) AppleCare Tier 2 CPU/Mac+ Chat Advisors; (9) AOS Customer Service Representatives; (10) AppleCare Team Lead; and (11) IT SC Agents." Kelly contends that some of these titles indicate salaried positions that are exempt from the overtime pay requirement under the FLSA. *See* 29 U.S.C. § 213(a)(1) (excluding from the regulations of the overtime pay provisions "any employee employed in a bona fide executive, administrative, or professional capacity"); 29 C.F.R. pt. 541 (outlining the scope of the section 213 exemption). Kelly also asserts that agents in different roles use various combinations of 35 different computer and telecommunication programs and systems in their work, but, based on its review of declarations submitted by 20 potential opt-in plaintiffs, only three of those systems were used by all of the declarants.

Gaffers submitted a copy of a policy letter from Kelly addressed to its "AppleCare Advisors," suggestively entitled "Getting Paid Correctly! Read the Instructions Here!!!" Plf.'s Mot., Ex. D. That document offers the following directions to employees about the limits on time they could be paid for starting up and shutting down or dealing with technical issues relating to their computer and communication systems:

> Note that no more than 5 minutes of "boot up" or "boot down" time will be paid. This means that that iDesk login time should not be more than five minutes prior to the start of shift — for example, if you start at 10am, you should not log into iDesk prior to 9:55am. You also should log into iLog right after logging into iDesk.
> . . .
> Note that you will NOT get paid for the time you are on hold with the Help Desk or Attendance Line. You will also not get paid for the duration of that tech issue . . . you will only get paid when reporting it to the Help Desk or Attendance Line.

*Id.* at 3.  Gaffers also submitted declarations from six current or former Kelly employees.  The declarants worked as virtual call center agents for Kelly through various dates between 2013 and today.  They all were paid on an hourly basis, at rates ranging from $10 to $12 per hour.  They all stated that they were subject to Kelly's policy by which they were paid no more than 10 minutes per day for time spent on startup and shutdown tasks.  Each of the declarants stated that s/he regularly worked more than 40 hours per week, and estimated that s/he spent significantly more than 10 minutes per day in unpaid overtime on startup and shutdown tasks:

- Margaret Key worked from May 2012 to June 2014.  She regularly spent an average of 15 minutes per day on startup and login tasks, and five to 10 minutes per day logging out and shutting down systems that she used.  Supp. Decls. [dkt. #41], Ex A (Pg ID 873).
- Erica Ramsey worked from September 2015 to December 2015.  She typically spent between 5 and 20 minutes on startup tasks, and between eight and 30 minutes on shutdown tasks.  Supp. Decls. [dkt. #41], Ex B (Pg ID 878).
- Robert Sabot worked from August 2014 to November 2015.  He estimated that he spent between 15 and 30 minutes per day on startup tasks, and between 10 and 20 minutes per day on shutdown tasks.  Supp. Decls. [dkt. #41], Ex C (Pg ID 883).
- Duane Truax worked from October 2011 to July 2013.  He spent an average of 20 minutes per day on startup tasks, and between 20 minutes and two hours per day on shutdown tasks.  Supp. Decls. [dkt. #41], Ex D (Pg ID 888).
- Nhadia Montreuil was hired in May 2015 and still works for Kelly. She spends an average of 10 to 20 minutes per day on startup tasks, and between five and 30 minutes per day on shutdown tasks.  Supp. Decls. [dkt. #49], Ex A (Pg ID 960).
- Tressie Rhymer worked from December 2014 to November 2015.  She spent between 20 minutes and two hours each day on startup tasks, and between 30 minutes and two hours on shutdown tasks.  Supp. Decls. [dkt. #49], Ex B (Pg ID 966).

Kelly asserts that, since November 2014, all Kelly employees, including 10 of the 20 identified potential opt-in plaintiffs, were required as a condition of hiring or continued employment to sign an agreement to submit to arbitration any employment-related disputes that may arise in the course of their work.  That agreement contains provisions by which the employees are required to (1) submit without exception to binding arbitration as the sole remedy for all claims they may have against Kelly for breach of contract or unpaid wages; (2) accept a shortened 300-day limitations

-5-

period for all claims submitted to arbitration; and (3) waive any right to participate in or recover

from any form of class or collective action.  The agreement also prohibits any arbitrator from

presiding over any form of collective or class proceeding or supervising any procedure for providing

notice of possible claims to any group of potential plaintiffs.  The operative provisions read in full

as follows:

> 1. Agreement to Arbitrate.  Kelly Services, Inc. and its subsidiaries ("Kelly" or "Kelly Services") and I agree to use binding arbitration, instead of going to court, for any "Covered Claims" that arise between me and Kelly Services . . . .   This Agreement will survive and apply to any and all periods of employment or re-employment with Kelly Services.
> . . .
> 2. Claims Subject to Agreement.  The "Covered Claims" under this Agreement shall include all common-law and statutory claims relating to my employment, including, but not limited to, any claim for breach of contract [or] unpaid wages. . . .  I understand and agree that arbitration is the only forum for resolving Covered Claims, and that both Kelly Services and I hereby waive the right to a trial before a judge or jury in federal or state court in favor of arbitration for Covered Claims.
> . . .
> 6. Limitations on Actions.  Kelly Services and I agree to bring any claims that each party may have against the other within 300 days of the day that such party knew, or should have known, of the facts giving rise to the cause of action, and the parties mutually waive any longer, but not shorter, statutory or other limitations periods.
> . . .
> 8. Waiver of Class and Collective Action Claims.  Both Kelly Services and I also agree that all claims subject to this agreement will be arbitrated only on an individual basis, and that both Kelly Services and I waive the right to participate in or receive money or other relief from any class, collective, or representative proceeding.  No party may bring a claim on behalf of other individuals, and no arbitrator hearing any claims under this agreement may: (i) combine more than one individual's claim or claims into a single case; (ii) order, require, participate in or facilitate production of class-wide contact information or notification of others of potential claims; or (iii) arbitrate any form of a class, collective, or representative proceeding.

Ramsey Agreement at 1-2 (Pg ID 1400-01).

Gaffers filed his complaint in this case on January 14, 2016.  In one count, he alleged that

the defendant failed or refused to pay him and numerous similarly situated employees overtime

wages for time they were required to work at the start and end of each work shift logging into and out of various computer and telephone systems they are required to use for their work, contrary to 29 U.S.C. § 207.  He seeks to certify a collective action under the FLSA, 29 U.S.C. § 216(b), on behalf of himself and "[a]ll current and former hourly home-based customer care agents who worked for Defendant at any time during the last three years."  The complaint as originally filed also set forth a second count for breach of contract and sought to certify a nationwide class on that claim under Federal Rule of Civil Procedure 23, but the parties stipulated to dismiss the breach of contract and Rule 23 class claims.

Kelly filed a motion to dismiss on February 29, 2016, which the Court denied on June 7, 2016.  Gaffers filed his pre-discovery motion for conditional certification of a collective action early in the case, on January 29, 2016.  The parties filed a flurry of other preliminary motions, and the Court summarily addressed those motions after a hearing on April 6, 2016.  Kelly filed its renewed motion to compel arbitration and partially to dismiss the complaint on June 6, 2016.  Those two motions remain pending and are addressed in this order.

## II.  Motion to Stay and Compel Arbitration

Kelly maintains that none of the employees who signed the standard employment agreement after November 2014 can participate in a collective action, and they must seek redress of their FLSA claims through arbitration on an individual basis.  Kelly looks to the Federal Arbitration Act (FAA) for fortification of its position, and it insists that the Court must compel arbitration of those claims. It contends that this case should either be dismissed or stayed as to the claims of those plaintiffs who signed arbitration agreements, and also should be stayed as to the claims of the remaining plaintiffs who did not sign the agreement to arbitrate, to avoid inconsistent rulings on overlapping issues of

fact and law applicable to all of the claims.  The plaintiff argues that the defendant has not established that the arbitration agreement is valid or enforceable as to any defined group of plaintiffs, and it has several facial defects that mitigate against enforcing it, including the class action waiver, which renders the agreement unenforceable, citing the Seventh Circuit's recent decision in *Lewis v. Epic Systems Corp.*, 823 F.3d 1147 (7th Cir. 2016).

Congress has established a "liberal federal policy favoring arbitration agreements," *AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986), by enacting the FAA "in response to widespread judicial hostility to arbitration," *Am. Exp. Co. v. Italian Colors Rest.*, --- U.S. ---, 133 S. Ct. 2304, 2308-09 (2013).  The core provision of the FAA states:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Federal courts "rigorously enforce" contractual arbitration agreements "according to their terms," including in cases that involve "claims that allege a violation of a federal statute, unless the FAA's mandate has been 'overridden by a contrary congressional command.'"  *Italian Colors*, 133 S. Ct. at 2309 (citations omitted).  The purpose of section 2, then, is "to make arbitration agreements as enforceable as other contracts, but not more so."  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967).  As the Seventh Circuit recently pointed out, section 2's "'saving clause permits agreements to arbitrate to be invalidated by "generally applicable contract defenses," . . . but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'"  *Lewis*, 823 F.3d at 1156 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).  One of those "applicable contractual

-8-

defenses" is illegality, since "illegal promises will not be enforced in cases controlled by the federal law." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982); *see Lewis*, 823 F.3d at 1157.

In *Lewis*, the Seventh Circuit held that an employment agreement that required employees to litigate wage and hour claims only through individual arbitration collided with the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151, *et seq.*, and therefore was illegal and unenforceable under the FAA. The court reasoned that a restriction in an employment agreement that barred collective actions violated the NLRA's grant of the right to employees "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Id.* at 1151-52 (quoting 29 U.S.C. § 157). Perhaps it does, but the Court finds it unnecessary to reach that question under the NLRA.

Kelly's employment agreement bars employees from collectively litigating employment disputes in any forum. By itself, there is nothing illegal about an agreement that includes a waiver of class arbitration. In *Italian Colors*, the Supreme Court held that such a waiver was allowed in a merchant credit card subscription contract that effectively prevented an antitrust class-action suit because "[t]he antitrust laws do not 'evinc[e] an intention to preclude a waiver' of class-action procedure." 133 S. Ct. at 2309 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). And in *AT&T Mobility LLC v. Concepcion*, the Court held that the FAA pre-empted a state law barring enforcement of a class-arbitration waiver in a consumer protection case.

There also is nothing inherently illegal about a contract that requires employment disputes generally to be brought only in an arbitral forum. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500

-9-

U.S. 20, 28 (1991) (approving arbitration agreement as applied to an age discrimination claim under the Age Discrimination in Employment Act (ADEA)); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 666 (6th Cir. 2003) (generally approving employment an contract that compelled arbitration of a discrimination case under Title VII).

But the cases approving arbitration agreements that barred class or employment litigation did not address claims arising from Congressional enactments that included the right to bring collective actions. The plaintiff's claim in this case arises under the Fair Labor Standards Act. By enacting the FLSA, Congress authorized "[a]n action to recover [unpaid minimum wages and overtime compensation] against any employer (including a public agency) in any Federal or State court of competent jurisdiction [to be brought] by any one or more employees for and in behalf of himself or themselves *and other employees similarly situated*." 29 U.S.C. § 216(b) (emphasis added). The question presented by this case is whether an employer may induce an employee to contract around that right. If it cannot, then contract provisions that have the effect of barring collective actions under the FLSA are illegal and therefore unenforceable under the FAA.

"'Congress passed the FLSA with broad remedial intent,' to address 'unfair method[s] of competition in commerce' that cause 'conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Monroe v. FTS USA, LLC*, 815 F.3d 1000, 1008 (6th Cir. 2016) (quoting *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015); 29 U.S.C. § 202(a)). "The provisions of the statute are 'remedial and humanitarian in purpose,' and 'must not be interpreted or applied in a narrow, grudging manner.'" *Ibid.* (quoting *Herman v. Fabri-Centers of America, Inc.*, 308 F.3d 580, 585 (6th Cir. 2002)). "To effectuate Congress's remedial purpose, the FLSA authorizes collective actions 'by any

-10-

one or more employees for and on behalf of himself or themselves and other employees similarly situated.'" *Ibid.* (quoting 29 U.S.C. § 216(b)).

"The Supreme Court has made clear that statutory rights, such as those created by Title VII, may be subject to mandatory arbitration only if the arbitral forum permits the effective vindication of those rights." *Morrison*, 317 F.3d at 658. "'[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.'" *Id.* at 28 (quoting *Gilmer*, 500 U.S. at 28). However, the Sixth Circuit has recognized that the statutory rights granted to employees under the FLSA warrant stricter conservation than those under Title VII and other civil rights laws, because the employer that convinces its employees to forego those rights, such as the entitlement to a minimum wage, would gain a critical economic advantage over its competitors who fully comply with the law. That, the court of appeals has said, is precisely the outcome the FLSA was enacted to prevent. The Sixth Circuit gave considerable attention to this point in *Boaz v. FedEx Customer Info. Servs., Inc.*, 725 F.3d 603, 606-07 (2013), where it refused to enforce a clause in an employment agreement that purported to shorten the limitations period for FLSA claims from three years to six months. The court emphasized that "[a]n employment agreement 'cannot be utilized to deprive employees of their statutory [FLSA] rights.'" *Id.* at 606 (quoting *Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of America*, 325 U.S. 161, 167 (1945)).

Later, in its decision in *Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 592 (6th Cir. 2014), the court of appeals considered a clause in a separation agreement signed by terminated employees that contained a comprehensive waiver of any right to pursue class or collective action claims for unpaid wages under the FLSA. The *Killion* court concluded that the waiver was invalid

-11-

because it would deprive the employees of the right to pursue a collective action, which expressly was guaranteed by the FLSA. However, the court noted that there was no arbitration provision in the settlement agreement, and it therefore found "no countervailing federal policy that outweighs the policy articulated in the FLSA." *Ibid.* The Sixth Circuit has not confronted the question whether a purported waiver of the right to pursue a collective action in any forum is valid when embedded in an agreement to submit to binding arbitration individual claims (and only individual claims) under the FLSA. *Id.* at 591 ("[N]one of our precedents permitting arbitration of FLSA claims has addressed employees' collective-action rights.").

Other circuits have held that employers do not commit an unfair labor practice by requiring employees to sign arbitration agreements that contain waivers of the right to bring class or collective actions. *Cellular Sales of Missouri, LLC v. NLRB*, 824 F.3d 772, 776 (8th Cir. 2016) ("[W]e conclude that Cellular Sales did not violate section 8(a)(1) [of the NLRA] by requiring its employees to enter into an arbitration agreement that included a waiver of class or collective actions in all forums to resolve employment-related disputes."); *Murphy Oil USA, Inc. v. NLRB*, 808 F.3d 1013, 1018 (5th Cir. 2015) ("Murphy Oil committed no unfair labor practice by requiring employees to relinquish their right to pursue class or collective claims in all forums by signing the arbitration agreements at issue here.") (collecting cases). As noted above, the Seventh Circuit split from that line of reasoning when it decided in *Lewis* that where an arbitration agreement "precludes employees from seeking any class, collective, or representative remedies to wage-and-hour disputes, [the agreement] violates Sections 7 and 8 of the NLRA," and "[n]othing in the FAA saves the ban on collective action." *Lewis*, 823 F.3d at 1161.

The Ninth Circuit has followed *Lewis*'s reasoning, holding that an employment agreement that restricts employees from litigating employment disputes only in "separate proceedings" violates the NLRA and cannot be enforced. *Morris v. Ernst & Young, LLP*, No. 13-16599, 2016 WL 4433080, at *2 (9th Cir. Aug. 22, 2016) ("Concerted activity — the right of employees to act *together* — is the essential, substantive right established by the NLRA. 29 U.S.C. § 157. Ernst & Young interfered with that right by requiring its employees to resolve all of their legal claims in 'separate proceedings.' Accordingly, the concerted action waiver violates the NLRA and cannot be enforced."). Various district courts have followed, distinguished, or declined to adopt *Lewis*'s holding. *See Tigges v. AM Pizza, Inc.*, No. 16-10136, 2016 WL 4076829, at *16 (D. Mass. July 29, 2016) ("What are the class actions before the Court, if not employees 'band[ing]' together, as a class, in 'confronting' their employer 'regarding the terms . . . of their employment?'") (denying motion to dismiss and granting Rule 23 motions for class certification); *Bruster v. Uber Technologies, Inc.*, No. 15-2653, 2016 WL 4086786, at *3 (N.D. Ohio Aug. 2, 2016) ("*Lewis* analyzed and invalidated a mandatory arbitration provision. . . . In this case, the Uber agreement allowed drivers like Plaintiff to opt-out of the arbitration provisions within thirty days of signing up to drive with Uber. . . . [The agreement therefore] does not impinge on any NLRA rights Plaintiff has, if any, because Plaintiff Bruster could have opted out of arbitration."); *Bekele v. Lyft, Inc.*, No. 15-11650, 2016 WL 4203412, at *20 (D. Mass. Aug. 9, 2016) ("[I]t is clear from the text of the NLRA that an employee's ability to bring a class action against his employer under Rule 23 is not a substantive right protected by the statute."). It is worth noting that the *Tigges* and *Bekele* decisions within mere weeks reached opposite outcomes on the same question. The *Bekele* court cited the *Tigges* decision in a footnote, but declined to address its reasoning. However, both cases are

-13-

distinguishable from the present action because they involved putative class actions under Rule 23, not collective actions under section 216(b). The *Bekele* court noted this distinction where it observed that "an employee's ability to bring a class-action lawsuit under [Rule 23] is of a different class or character than the enumerated rights [under the FLSA]," and "it is far from clear that Congress's intent in enacting the NLRA was to prevent an employee from freely waiving his right to bring a Rule 23 class action, a right that did not exist when the NLRA was enacted," *Bekele*, 2016 WL 4203412, at *20.

In *Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326 (11th Cir. 2014), the Eleventh Circuit approved an arbitration agreement that barred collective actions under the FLSA, because that court could "discern no 'contrary congressional command' that precludes the enforcement of plaintiffs' Arbitration Agreements and their collective action waivers." *Id.* at 1334. The court relied heavily on *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989), in which the Supreme Court held that collective action language in the ADEA mirrored the enforcement mechanism Congress approved in the FLSA, and *Gilmer v. Interstate/Johnson Lane Corp.*, which approved arbitration of ADEA claims and implied that a waiver of the right to bring a collective action would be acceptable. But the *Walthour* court failed to consider one of the principal rationales for precluding employers from contracting around an employee's FLSA rights: that "an employer . . . gains a competitive advantage by doing so." *Boaz*, 725 F.3d at 606 (reasoning that "[t]he [Supreme] Court's rationale for prohibiting waiver of FLSA claims is . . . not present for [employment discrimination] claims").

After reviewing the controlling decisions on point, it is safe to conclude that the agreement to arbitrate in this case cannot be enforced to bar the plaintiffs from pursing a collective action in

-14-

any forum to resolve their unpaid overtime claims.  The Sixth Circuit has not directly addressed the question, and neither has the Supreme Court.  However, their decisions nearest the issue strongly suggest that when they do, their answer will be nearer that of the Seventh Circuit in *Lewis* than it will be to the reasoning of those courts of appeals that have adopted the contrary rule.  There are several reasons for this conclusion.

*First*, it is beyond question that "Section 16(b) of the FLSA *gives employees the right* to bring a private cause of action *on their own behalf and on behalf of 'other employees similarly situated'* for specified violations of the FLSA." *Genesis Healthcare Corp. v. Symczyk*, --- U.S. ---, 133 S. Ct. 1523, 1527 (2013) (emphasis added).  The *Lewis* court seems to suggest otherwise, *see* 823 F.3d at 1161 ("while the FLSA and ADEA allow class or collective actions, they do not guarantee collective process."), but the Sixth Circuit has held that "a plaintiff's right to participate in a collective action [under the FLSA] cannot normally be waived."  *Killion*, 761 F.3d at 590. There is no reason, therefore, to consider the impact of the NLRA on Kelly's employment contract.

*Second*, this right to a collective action is not "merely procedural," and the law recognizes no such distinction between "procedural" and "substantive" rights under the FLSA.  *Boaz*, 725 F.3d at 606 ("FedEx extrapolates that employees can waive their 'procedural' rights under the FLSA even if they cannot waive their 'substantive' ones," but "the FLSA caselaw does not recognize any such distinction.").  Moreover, the Supreme Court has recognized the substantive distinction between individual and collective litigation of disputes, and it has held that the difference is so consequential to a party's rights that a court cannot compel it "under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 687 (2010); *see also Reed Elsevier, Inc. ex rel. LexixNexis*

-15-

*v. Crockett*, 734 F.3d 594, 598-99 (6th Cir. 2013) ("[W]hether the parties arbitrate one claim or 1,000 in a single proceeding is no mere detail. . . . [T]he question whether the parties agreed to classwide arbitration is vastly more consequential than even the gateway question whether they agreed to arbitrate bilaterally."); *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 334 (3d Cir. 2014) ("Traditional individual arbitration and class arbitration are so distinct that a choice between the two goes, we believe, to the very type of controversy to be resolved.") (citing *Reed Elsevier*).

*Third*, notwithstanding the well established disposition of the federal courts toward upholding valid arbitration agreements, it is equally well established that no form of contract may be construed to force a waiver of an employee's rights under the FLSA. *Morris*, 2016 WL 4433080, at *7 (declaring that "if a contract term in an arbitration agreement 'operate[s] . . . as a prospective waiver of a party's right to pursue statutory remedies for [substantive rights], we would have little hesitation in condemning the agreement'") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985)); *Boaz*, 725 F.3d at 606-07 ("The limitations provision in Boaz's employment agreement operates as a waiver of her FLSA claim.  As applied to that claim, therefore, the provision is invalid.").  That is because rights under the FLSA, unlike those under other employment discrimination statutes such as the ADEA or Title VII, cannot be waived, since allowing employees to waive those rights (and thereby permitting employers to induce employees to do so), would give employers who manage to secure such waivers a substantial economic advantage over their competitors, and that outcome is the exact result that the FLSA's uniform wage regulations were enacted to prevent.  *Killion*, 761 F.3d at 592 ("*Boaz* is based on the general principle of striking down restrictions on the employees' FLSA rights that would have the effect of granting their employer an unfair advantage over its competitors.").

-16-

The right to pursue litigation collectively to recover unpaid overtime is no different in this respect than the right to receive overtime pay, because the employer that absconds from collective litigation of such claims secures for itself the same unfair competitive advantage that it would by refusing to pay at the required rates in the first instance. *Ibid.* ("Requiring an employee to litigate on an individual basis grants the employer the same type of competitive advantage as did shortening the period to bring a claim in *Boaz*. And in cases where each individual claim is small, having to litigate on an individual basis would likely discourage the employee from bringing a claim for overtime wages."). The putative ban on proceeding by collective action in any forum is no less an injury to an employee's FLSA rights than an attempt to shorten the applicable statute of limitations:

> We have little reason to think that the right to participate in a collective action should be treated any differently than the right to sue within the full time period allowed by the FLSA. The concern, *Boaz* explained, is that "an employer could circumvent the Act's requirements — and thus gain an advantage over its competitors — by having its employees waive their rights under the Act."

*Id.* at 591 (citation omitted).

As the Sixth Circuit plainly has held, an employer may not abrogate its employee's rights under the FLSA by purporting to obtain the employee's contractual consent to give up those rights. *Boaz*, 725 F.3d at 607. Moreover, "an employee can waive his right to a judicial forum only if the alternative forum 'allow[s] for the effective vindication of [the employee's] claim.'" *Id.* at 606-07 (quoting *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 313 (6th Cir. 2000)). Here, the agreement cannot reasonably be construed to allow for effective vindication of the plaintiffs' collective claims for unpaid overtime, where it would expressly prohibit them from bringing any such claims in any forum, arbitral or judicial.

-17-

*Fourth*, the arbitration provision in the defendant's employment contract, coupled with the class-waiver provision, is unlawful when applied to claims for collective actions under the FLSA. Consequently, it is unenforceable under the FAA's savings clause on a "ground[] [that] exist[s] at law or in equity for the revocation of any contract."  9 U.S.C. § 2; *Lewis*, 823 F.3d at 1159-60 (noting that "'[t]o immunize an arbitration agreement from judicial challenge on' a traditional ground such as illegality 'would be to elevate it over other forms of contract — a situation inconsistent with the "saving clause"'") (quoting *Prima Paint*, 388 U.S. at 404 n.12).  The illegality defense is not one that "appl[ies] only to arbitration or . . . derive[s its] meaning from the fact that an agreement to arbitrate is at issue."  *Concepcion*, 563 U.S. at 339.  The collective action waiver, although tied to the arbitration provision, is not dependent on it.  As the Ninth Circuit explained:

> The illegality of the "separate proceedings" term here has nothing to do with arbitration as a forum.  It would equally violate the NLRA [and the FLSA] for [the defendant] to require its employees to sign a contract requiring the resolution of all work-related disputes in court and in "separate proceedings."  The same infirmity would exist if the contract required disputes to be resolved through casting lots, coin toss, duel, trial by ordeal, or any other dispute resolution mechanism, if the contract (1) limited resolution to that mechanism and (2) required separate individual proceedings.  The problem with the contract at issue is not that it requires arbitration; it is that the contract term defeats a substantive federal right to pursue concerted work-related legal claims.  When an illegal provision not targeting arbitration is found in an arbitration agreement, the FAA treats the contract like any other; the FAA recognizes a general contract defense of illegality.

*Morris*, 2016 WL 4433080, at *6-7.

*Fifth*, the remedy addressing the illegality in this case cannot be to compel the post-November 2014 opt-in plaintiffs to take their collective action to arbitration.  If the agreement explicitly *permitted* collective arbitration, then the Court would be compelled to weigh carefully the federal policy interests in favor of and against compelling the parties to honor the agreement to arbitrate wage disputes.  But that is not the agreement before the Court, and the Court may not

-18-

construe it to allow collective arbitration in the absence of express consent to that form of action. *Stolt-Nielsen*, 559 U.S. at 684.  Kelly and some of its employees signed agreements to arbitrate *individually* all disputes they might have over unpaid overtime wages.  They did not agree to arbitrate collective claims, such as were brought in this case.  Kelly may not leverage the *absence* of consent to "opt out" of collective resolution of the plaintiffs' unpaid overtime claims, by the artifice of embedding a purported waiver of the right to collective litigation in an arbitration agreement covering only individual claims, because the right to proceed collectively under section 216(b) is not one that may be waived by contract, in an arbitration agreement or otherwise.  *Boaz*, 725 F.3d at 606-07.

The provision to require employees to arbitrate FLSA claims in an arbitral forum on an individual basis is illegal and cannot be enforced.  The Court, therefore, will deny the motion to stay the case and compel arbitration.

### III.  Motion to Certify Collective Action

The plaintiff and all the other opt-ins move to certify the action conditionally as a collective action under 29 U.S.C. § 216(b) for "[a]ll current and former hourly home-based customer care agents who worked for Defendant at any time during the last three years."  Kelly believes that the proposed class would consist of over 6,000 employees, many of whom work in job positions that differ from the plaintiff and the identified opt-ins.  It argues, therefore, that the case is not manageable as a collective action because resolution of the thousands of potential opt-in plaintiffs' claims would require a series of fact-specific, individualized inquiries to analyze the practices and experiences of each collective action member, on each computer, to assess the log-in, log-out and technical support time.

The class-based litigation format authorized by 29 U.S.C. § 216(b), labeled a collective action, "serves an important remedial purpose" by allowing "a plaintiff who has suffered only small monetary harm [to] join a larger pool of similarly situated plaintiffs" in order to reduce individual litigation costs and employ judicial resources efficiently. *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 586 (6th Cir. 2009) (citing *Hoffmann-La Roche*, 493 U.S. at 170). The statute sets out two requirements for collective actions: "1) the plaintiffs must actually be 'similarly situated,' and 2) all plaintiffs must signal in writing their affirmative consent to participate in the action." *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). The criteria in such cases generally are evaluated at various stages of the litigation. *Id.* at 546-47.

> At the notice stage, conditional certification may be given along with judicial authorization to notify similarly situated employees of the action. Once discovery has concluded, the district court — with more information on which to base its decision and thus under a more exacting standard — looks more closely at whether the members of the class are similarly situated.

*Monroe*, 815 F.3d at 1008 (citations omitted). "'[C]onditional certification' does not produce a class with an independent legal status, or join additional parties to the action." *Genesis Healthcare*, 133 S. Ct. at 1530. "The sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court." *Ibid.* (citation omitted). At the notice stage, "the certification is conditional and by no means final, and the plaintiff must show only that his position is similar, not identical, to the positions held by the putative class members." *Comer*, 454 F.3d at 546-47. "At the second stage, following discovery, trial courts examine more closely the question of whether particular members of the class are, in fact, similarly situated." *Id.* at 547. The preliminary decision to authorize notice "need only be based on a modest factual showing," the "determination is made

-20-

using a fairly lenient standard," and the analysis "typically results in conditional certification of a representative class." *Ibid.*

"[T]he FLSA's 'similarly situated' standard is less demanding than Rule 23's standard [for certification of a class action]." *Monroe*, 815 F.3d at 1009. When evaluating whether potential opt-in plaintiffs are similarly situated, the Sixth Circuit considers three non-exhaustive factors that many courts have found relevant: (1) the factual and employment settings of the individual plaintiffs; (2) the different defenses to which the plaintiffs may be subject on an individual basis; and (3) the degree of fairness and procedural impact of certifying the action as a collective action. *Ibid.* (collecting cases). Proof of a "unified policy" of violations is not required, and employees are similarly situated where they either (1) suffer from a single, FLSA-violating policy, or (2) have claims that are unified by common theories of the defendant's statutory violations, even if the proofs of those theories may be necessarily individualized and distinct. *Ibid.* When deciding whether certification of a collective action is appropriate, "[t]wo governing principles from [the] case law serve as guides: plaintiffs do not have to be 'identically situated' to be similarly situated, and the FLSA is a remedial statute that should be broadly construed." *Id.* at 1011.

The plaintiff easily has made the required "modest factual showing" to establish that a class of employees exist who have unpaid wage claims against the defendant with a common factual and legal nexus. He submitted declarations from six employees who worked for the defendant as virtual call center agents within the applicable limitations period, in the same or materially similar positions, with similar wage rates and weekly work schedules (all regularly exceeding forty hours per week). Those declarants all assert that they regularly spent, or still spend, substantially more than the 10 minutes per day that they are allowed to be paid for system startup and shutdown

-21-

activities on tasks required for the performance of their job, which involve starting, stopping, logging into, and logging out of, numerous computer and telecommunication systems. The plaintiff also submitted a copy of the defendant's written policy documenting the 10-minute per day limitation on time paid for "bootup" and "bootdown" activities, and the declarants all stated that their work was subject to that policy. That is a sufficient showing to establish that a class of potential opt-in plaintiffs exists consisting of persons who are similarly situated and have claims that are sufficiently factually aligned to allow them to proceed in a collective fashion.

The defendants embark on a discursive survey of minutiae relating to the potential plaintiffs' job descriptions, the nature of the various products for which they provide call center support services, and a laundry list of different computer and communication programs and systems that they use. They contend that these variations in the plaintiffs' circumstances render the dispute unmanageable as a collective action. But the plaintiffs need not show that they are identically situated in every detail in order to proceed collectively. Here, the plaintiffs all work in a virtual or remote call center environment, they all provide the same basic service (answering the phone and handling questions or complaints from customers of the "AppleCare" warranty and support program), and they all allege the same basic factual and legal premises in support of their unpaid overtime claims. The declarants also all contend that they are required to spend substantial amounts of time — in some cases an hour or more each day — on startup and shutdown tasks that are required for them to perform their jobs, and that Kelly refuses categorically to pay them for more than 10 minutes per day for those tasks. Those declarations establish that the employees suffer from a single, FLSA-violating policy, and they have claims that are unified by common theories of the defendant's statutory violations, even though the proofs of those theories may be necessarily

-22-

individualized and distinct.  *See Monroe*, 815 F.3d at 1009.  In fact the case is nearly on all fours with the facts in *Monroe*:

> [T]he record reveals that all FTS Technicians work in the same position, have the same job description, and perform the same job duties: regardless of location, "the great majority of techs do the same thing day in and day out which is install cable." FTS Technicians also are subject to the same timekeeping system (recording of time by hand) and compensation plan (piece rate).
>
> Key here, the record contains ample evidence of a company-wide policy of requiring technicians to underreport hours that originated with FTS executives.

*Monroe*, 815 F.3d at 1011.  Here, as in *Monroe*, the potential opt-in plaintiffs that so far have been identified all do (or did) the same thing day in and day out, which is answering the phone and fielding customer support queries.  They all are subject to the same hourly pay scheme, they all are required to submit their time using the defendant's time reporting systems, and they all are (or were) subject to the 10-minute time limit policy.

Moreover, at the notice stage, "the certification is conditional and by no means final," and the "determination is made using a fairly lenient standard."  *Comer*, 454 F.3d at 547.  That lenient threshold easily is surpassed here.  The defendants' concerns about exclusion of potential class members who may be exempt from overtime, and other matters that may suggest partitioning of the proofs at trial regarding discrete groups within the class, may be addressed by an appropriately tailored scope of certification after the contours of the class fully are explored through discovery. That "second stage [of certification], following discovery," is the time when the Court must "examine more closely the question of whether particular members of the class are, in fact, similarly situated," to determine if any identifiable groups of plaintiffs cannot proceed collectively with the rest.  *Ibid.*; *see also Monroe*, 815 F.3d at 1011 ("The district court made its final certification determination post-trial. With the benefit of the entire trial record — including representative

testimony from technicians covering the several regions in which FTS operates — the court found that FTS Technicians were similarly situated and a collective action was appropriate.").  The fact that there may be some cognizable discrepancies between certain groups of plaintiffs is not a basis for denying certification of a collective action, either at the notice or final stages.  *Monroe*, 815 F.3d at 1012 (emphasizing that "[t]he definition of similarly situated does not descend to such a level of granularity").

The defendant's contention that the resolution of the case will require a exhaustive "minute by minute" inquiry into the exact circumstances and work record of each identified opt-in plaintiff is ill-founded.  It is well accepted that no such pedantic ordeal is required either in discovery or at trial in order to assess efficiently and justly the extent of unpaid wages claimed by the plaintiffs, or the defendant's factual defenses to their claims.  Adequately developed representative testimony and statistical surveys may be used to assess, both on a collective and an individual basis, the extent of an employer's liability on unpaid overtime claims.  *Tyson Foods, Inc. v. Bouaphakeo*, --- U.S. ---, 136 S. Ct. 1036, 1043-44 (2016); *see also Monroe*, 815 F.3d at 1017 ("In FLSA cases, the use of representative testimony to establish liability has long been accepted.").  It is equally well established that "individualized defenses alone do not warrant decertification where sufficient common issues or job traits otherwise permit collective litigation."  *Monroe*, 815 F.3d at 1013. Where the employer has an adequate opportunity at trial to present testimony to establish its factual defenses on either an individual or a aggregate basis, collective resolution of unpaid overtime claims will be appropriate, and damages may be assessed by reliance on either aggregate or individual calculations for damages.  *Ibid.*  The defendant certainly will have its opportunity with the aid of

discovery and in its trial presentation fully to explore the distinctions between groups of the opt-in plaintiffs that it contends may affect its liability to them.

Finally, it is worth noting that, even at this preliminary stage of the case, the defendant evidently has had no difficulty defining with some precision the contours of the population of potential opt-in plaintiffs; it already asserts that it knows all of the job titles under which they worked, the full retinue of computer and telecommunication systems that are used by different groups of employees, and that some of those positions may be exempt from the overtime pay regulations. The defendant's exhaustive presentation on the details of the potential plaintiffs' employment circumstances belies its contention that the case is hopelessly intractable as a collective action, and in fact suggests the opposite.

The motion to certify the class conditionally will be granted.

IV.  Conclusion

The provision of Kelly's post-November 2014 employment agreement that bars class claims is unenforceable, and the arbitration agreement does not otherwise permit class-claim arbitration. The plaintiff has established the requisites for collective action certification.

Accordingly, it is **ORDERED** that the hearing on the defendant's renewed motion to stay the action and compel arbitration, and the plaintiff's motion for conditional certification, is **CANCELLED**.

It is further **ORDERED** that the defendant's renewed motion to stay the action and compel arbitration [dkt. #61] is **DENIED**.

It is further **ORDERED** that the plaintiff's motion for conditional certification of his Fair Labor Standards Act claim as a collective action [dkt. #7] is **GRANTED**. The collective action

-25-

class is defined as all current and former hourly home-based customer care agents who worked for Kelly Services, Inc. or its subsidiaries at any time on or after August 24, 2013.

It is further **ORDERED** that the defendants must furnish to counsel for the plaintiffs the last known post office and email addresses of the potential members of the described class **on or before September 7, 2016**.

It is further **ORDERED** that the plaintiff shall deliver notice promptly to putative class members by United States mail, email, or both.  The notice shall state that interested persons may opt in to this litigation **on or before November 7, 2016**, but not thereafter.

It is further **ORDERED** that counsel for the parties appear before the Court for a case management conference on **September 8, 2016 at 3:30 p.m.**

                                        s/David M. Lawson
                                        DAVID M. LAWSON
                                        United States District Judge

Dated:   August 24, 2016

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 24, 2016.

                        s/Susan Pinkowski
                        SUSAN PINKOWSKI

---

-26-